## County of Jasper *v.* Ballou.

The charter of a railroad company in Illinois allowed counties, &c., to subscribe to the stock of the corporation and issue bonds in payment, if a majority of voters, at an election called by the *county court*, should favor the subscription. The voters of a county, which had adopted a township organization, voted in favor of subscribing to the stock at an election called by its *board of supervisors*. A subsequent statute, relating to the company, provides that "all elections held for the purpose of voting said stock, and the manner in which said stock was voted, are hereby legalized in all respects, and the stock to be subscribed in the manner the same was voted." On the authority of this act and the election, the board of supervisors issued bonds of the county. At this time a county court existed in the county. Before the bonds fell due, a statute was passed authorizing municipal corporations, &c., to fund their bonds, which, in brief, declared that in cases where a county, &c., had issued bonds for subscription to railroad companies, &c., "which are now binding or subsisting legal obligations," and "which are properly authorized by law," the county, &c., might, on surrender of such bonds, issue new ones, with the provision that the issue should first be authorized by a vote of the majority of the legal voters of the county, &c. Conformably to this provision, and pursuant to such a vote, the board of supervisors issued, in exchange for the old bonds, funding bonds, having a longer period to run and bearing a lower rate of interest. In a suit against the county by a holder of funding bonds, which he had received in exchange for surrendered bonds, — *Held*, 1. That the vote of the people at the last election recognized the original bonds as binding and subsisting obligations, and that the county is therefore estopped from setting up that they were invalid because voted for at an election called by the board of supervisors instead of by the county court. 2. That where, at an election held according to law, the people of a county authorized their proper representatives to treat certain outstanding county obligations as properly authorized by law for the purpose of settling with the holders, and the settlement has been made, the validity of the obligations can no longer be contested.

Error to the Circuit Court of the United States for the Southern District of Illinois.

The facts are stated in the opinion of the court.

*Mr. John M. Palmer* for the plaintiff in error.
*Mr. D. T. Littler, contra.*

Mr. Chief Justice Waite delivered the opinion of the court.

The Constitution of Illinois, which went into effect April 1, 1848, contained the following: —

"Art. VII., Sect. 6. The General Assembly shall provide by a general law, for township organization, under which any county may organize whenever a majority of the voters of such county, at any general election, shall so determine, and whenever any county shall adopt a township organization, so much of this constitution as provides for the management of the fiscal concerns of the said county by the county court may be dispensed with, and the affairs of the said county may be transacted in such manner as the General Assembly may provide."

Accordingly, in February, 1849, a law was passed authorizing the township organization of counties, and directing that, when such an organization was adopted, the affairs of the county should be conducted by a board of supervisors. Counties not under township organization were managed by county courts.

The Grayville and Mattoon Railroad Company was incorporated Feb. 6, 1857, and on the 1st of March, 1867, its charter was amended so as to allow counties to subscribe to the stock and issue bonds in payment, if a majority of the voters of the county, at an election called by the *county court*, should vote in favor of such a subscription. The county of Jasper, through which the road of the company ran, was under township organization, and its *board of supervisors* called upon the voters of the county to vote at an election to be held on the 7th of April, 1868, whether a subscription of $100,000 should be made to the stock of the company by the county, payable in bonds of the county, to be issued as the work progressed, one-sixth of which were to fall due annually from the time they were put out. The election was held, and resulted in a majority in favor of the subscription. At a meeting of the board of supervisors, Jan. 23, 1863, the chairman was authorized to subscribe the stock as soon as it might legally be done. An act of the General Assembly of the State, approved March 27, 1869 (Acts of 1869, vol. iii. p. 360), relating to this company, and to votes which had been taken for subscriptions to its stock, contained the following as sect. 3 : —

"That all elections held for the purpose of voting said stock, and the manner in which said stock was voted, are hereby legalized in all respects, and the stock to be subscribed in the manner the same was voted."

On the authority of these several acts and this election the board of supervisors issued one hundred bonds of $1,000 each, in the following form : —

"Know all men by these presents, that the county of Jasper, State of Illinois, acknowledges itself to be indebted in the sum of one thousand dollars lawful money of the United States of America, which said sum of money the said county promises to pay the Grayville and Mattoon Railroad Company or bearer, at the office of the county treasurer of said county, on the first day of      in the year of our Lord one thousand eight hundred and    with interest at the rate of ten per centum per annum, which interest shall be payable on the first day of each year, at the office of the' treasurer of said county, on the presentation and delivery of the coupons severally hereto annexed.

"This bond is issued under and by virtue of a law of the State of Illinois, entitled an act to incorporate the Grayville and Mattoon Railroad Company, passed February 6, 1857, and amendatory acts thereto in force March 1st, 1867, and March 27, 1869, in compliance with a vote of the electors of said county at an election held April 7, 1868, in accordance with said acts.

"This bond is one of a series limited to one hundred thousand dollars, one-sixth of the amount made payable annually, at ten per centum per annum, issued for stock in the Grayville and Mattoon Railroad Company by the county of Jasper, and placed in trust for delivery only by the trustee herein named, to wit,      of the county of Jasper, which shall not become obligatory unless the certificate indorsed hereon be signed by said trustee.

"The faith of the county of Jasper is hereby pledged for the payment of the principal sum and interest aforesaid.

"In testimony whereof, the county of Jasper by its chairman of the board of supervisors of said county and the clerk of the county court as *ex-officio* clerk of said board of supervisors have subscribed this bond this    day of    A. D. 187 .

                        " *County Clerk.*
       " *Chairman of the Board of Supervisors.*

"I hereby certify that this bond is one of a series of bonds held by me as trustee of the county of Jasper to be delivered to the Grayville and Mattoon Railroad Company as per order of the board as stated therein.

                                    " *Trustee.*"

The bonds fell due, some in 1877 and others in each year thereafter, until and including the year 1883. It nowhere appears when the bonds were put in the hands of the trustee, but none of them bore date prior to Oct. 19, 1876.

At all the times when these several things were done there was in the county of Jasper a county court as well as a board of supervisors.

On the 14th of April, 1875, the General Assembly passed an act, the material part of which is as follows : —

"SECT. 1. That in all cases where any county, city, town, township, school district, or other municipal corporation have issued bonds or other evidences of indebtedness for money on account of any subscription to the capital stock of any railroad company, or on account of or in aid of any public buildings or other public improvement, or for any other purposes which are now binding or subsisting legal obligations against any county, city, town, township, school district, or other municipal corporations, and remain outstanding and which are properly authorized by law, the proper authorities of any such county, city, town, township, school district, or other municipal corporation may upon the surrender of any such bonds or other evidences of indebtedness, or any number thereof, issue in place or in lieu thereof to the holders or owners of the same new bonds, &c. . . . And such new bonds or other evidences of indebtedness so issued shall show on their face that they are issued under this act : *Provided*, that the issue of such new bonds in lieu of such indebtedness shall first be authorized by a vote of a majority of the legal voters of such county, city, town, township, school district, or other municipal corporation, voting either at some annual or special election of such municipal corporation : *And provided further*, that such bonds or other evidences of indebtedness shall not be issued so as to increase the aggregate indebtedness of such municipal corporation beyond five per centum on the value of the taxable property therein, to be ascertained by the last assessment for State and county taxes prior to the issuing of such bonds or other evidences of indebtedness." Acts of 1875, p. 68.

Under the authority of this act the board of supervisors called an election of the voters of the county, to be held on the third day of April, 1877, for the purpose of voting for or against funding the " bonds issued to the Grayville and Mattoon Railroad Company for the sum of $100,000, drawing ten per

cent interest; said hundred bonds to be due in twenty years, and payable at the option of the county in ten years; said bonds to draw interest not to exceed seven per cent per annum, said interest to be payable semi-annually at the treasurer's office in Jasper County." At this election a majority of the voters were found to be in favor of the measure. Afterwards funding bonds were issued in exchange for old bonds in the following form: —

"For value received, the county of Jasper, in the State of Illinois, promises to pay the bearer one thousand dollars on the first day of May, A. D. 1897, with interest from date, payable on the first days of May and November in each year (on surrender of the annexed coupons), at the rate of seven per cent per annum, until the principal sum shall be paid.

"Principal and interest payable at the county treasurer's office, in the town of Newton, in said county. The county of Jasper reserves the right to pay this bond on or at any time after May 1st, 1887, upon giving at said place of payment, and also by an advertisement in some New York City daily newspaper at least six (6) months' notice of such intention, and interest shall cease from the day on which this bond is by such notice made payable.

"This bond is one of a series of bonds numbered from 1 to 100, inclusive, amounting in all to one hundred thousand dollars, issued by said county of Jasper, for the purpose of funding legally incurred indebtedness of the county and under and in accordance with an act of the General Assembly of the State of Illinois, approved April 14th, 1875, entitled 'An Act to amend an act entitled "An Act to enable counties, cities, townships, school districts, and other municipal corporations to take up and cancel outstanding bonds and other evidences of indebtedness, and fund the same," ' approved and in force March 26, 1872, all provisions of which act have been duly complied with.

"In testimony whereof, we, the undersigned, officers of Jasper County, being duly authorized to execute this obligation on its behalf, have hereunto set our signatures and affixed the county seal this     day of May, A. D. 1877.

[SEAL.]                                   "*County Clerk.*
                                          "*Chairman.*"

After these bonds were put out the indebtedness of the county exceeded somewhat five per cent of the value of the taxable

property as ascertained by the last preceding assessment. The plaintiff below, and defendant in error here, being the owner of coupons cut from some of the funding bonds falling due in May and November, 1878 and 1879, which were unpaid, brought this suit to recover them. He was the holder and in possession of a part or the whole of the original bonds when the funding took place, and took the funding bonds in exchange for such of the original bonds as he then held.

Upon this state of facts the court below gave judgment against the county. The case is now here by writ of error, and the single question is presented, whether the county made out a valid defence to the coupons sued on.

In our opinion the county is estopped from setting up the alleged invalidity of the original bonds as a defence in this action. It is true the funding law only authorized the funding of " binding and subsisting legal obligations," " properly authorized by law," but no new bonds could be issued in lieu of old ones except on a vote of the people. All outstanding bonds were not to be taken up in this way, but only such as were recognized by the people, acting together in their political capacity at an election for that purpose, as binding and subsisting legal obligations. After such a recognition the corporate authorities could make the exchanges, but not before.

The law under which the original bonds were put out was sufficient. No complaint is made of any illegality in its provisions. The only objection is that there was a mistake in carrying it into execution. The election was called by the wrong corporate agency. The county court should have brought the people together and not the board of supervisors. This, if there had been nothing more, would, under the rulings of the highest court of the State, made long before the vote was taken, render the bonds invalid. *Supervisors of Schuyler Co.* v. *People*, 25 Ill. 181. It was for this reason, undoubtedly, that the board of supervisors, at their meeting after the election, authorized the subscription to be made and the bonds delivered in payment *as soon as it might lawfully be done*, and that the act to legalize the election was passed in 1869. We have not had our attention called to any case in which the courts of the State had decided, before this funding took place, that, under

the Constitution of 1848, an act which simply legalized an invalid or irregular election for a subscription, and left the corporate authorities free to make the subscription at their option, would not cure any defect there may have been in the election, and empower the proper authorities to bind the county by anything that might be done under it and within its scope. It had been decided more than once that the legislature could not *compel* a municipal corporation to incur a debt without the consent of the corporate authorities. *Harward* v. *St. Clair Drainage Co.*, 51 Ill. 130; *Hessler* v. *Drainage Commissioners*, 53 id. 105; *Marshall* v. *Silliman*, 61 id. 218. But under the Constitution of 1848 a vote of the people was not essential to the validity of a municipal subscription to the stock of a railroad company. The legislature could authorize the corporate authorities, whoever they might be, to act in such a matter without the express direction of the people. What it could not do was to make it mandatory on them to subscribe without a vote. This we understand to have been the extent of the decisions, and in this way it was that, if with the legalization of the vote there was coupled a command on the corporate authorities to subscribe, or a confirmation of a subscription already made, the curative statutes were held to be inoperative. It had never been held that language, such as was employed in this curative act, was compulsory, or that it did more than legalize the election, leaving it for the board of supervisors to determine whether they would subscribe or not. That was an open question in the State courts until the case of *Gaddis* v. *Richland County* (92 id. 119), not decided until June, 1879, two years and more after the bonds now in question were out.

When, therefore, the people were called on to vote whether the old bonds should be funded, the facts they had to consider were these: A valid law authorizing the subscription and an issue of the bonds had been passed. The people, at an election which had been irregularly called, had voted to make the subscription and issue bonds bearing ten per cent interest, and all payable within six years. An act had been passed to legalize the election, and under it the subscription which had been voted was made, and bonds such as were contemplated had been issued and were then outstanding in the hands of various par-

ties. Whether these bonds were valid was, so far as any direct decisions were concerned, an open question, and certainly not free from doubt. Under these circumstances the question was directly put to the people of the county, in a manner authorized by law, whether they would recognize these bonds as "binding and subsisting legal obligations," and issue in lieu of them other bonds having twenty years to run and bearing seven per cent interest instead of ten; and they by their vote said they would. There is no complaint of any illegality in this election, or of fraud or imposition. So far as the record shows, the proposition to fund went from the county authorities to the bondholders, and not from the bondholders to the county. The facts were as well known to one party as the other. If the people intended to rely on their defences to the old bonds, then was the time for them to speak and by their vote say they would not recognize them as binding obligations. By voting the other way they, in effect, accepted them as legal and subsisting for the purposes of the proposed extension of time at reduced interest, and said to the holders if their proposition was accepted, no question of illegality would be raised. Their offer having been accepted, they are now estopped from insisting upon an irregularity which they have by their votes voluntarily waived, with a full knowledge of the facts. The case is clearly, as we think, within the principle acted on by the Supreme Court of the State in *President and Trustees of the Town of Keithsburg* v. *Frick*, 34 Ill. 405. As was very properly said below by the learned circuit judge, "there must be an end of these contests and defences some time or other." There must be a time when the people in their political capacity are concluded by their contracts as much as individuals, and we think that where the people of a county, at an election held according to law, authorize their corporate or political representatives to treat certain outstanding county obligations as "properly authorized by law" for the purpose of negotiating a settlement with the holders, and the settlement which was contemplated has been made, all contests as to the validity of the obligations must be considered as ended.

This disposes of all questions as to the excessive issue of bonds. For all the purposes of this case the original bonds

must be taken as binding. The issue of the funding bonds did not increase the aggregate of the indebtedness of the corporation, but only changed its form.

*Judgment affirmed.*