[Civil No. 2620. Filed April 18, 1927.]

[255 Pac. 490.]

PHILIP BUNTMAN and GEORGE O. FORD, Appellants, v. THE CITY OF PHOENIX, a Municipal Corporation, and FRANK A. JEFFERSON, LUKE W. HENDERSON, J. A. R. IRVINE, CHARLES E. MORTON, and A. L. BOEHMER, as Members of the City Commission of the City of Phoenix, Appellees.

Mr. Will E. Ryan, Mr. Robert McMurchie and Messrs. Stockton & Perry, for Appellants.

Mr. W. L. Barnum and Mr. James E. Nelson, for Appellees.

LOCKWOOD, J.—Philip Buntman and George O. Ford, hereinafter called plaintiffs, applied to the superior court of Maricopa county for an injunction for-

bidding the city of Phoenix, a municipal corporation, hereinafter called the city, and its commissioners, from holding an election for the purpose of submitting to the taxpaying qualified electors of said city the question of whether or not it should issue $750,000 of its serial bonds for the purpose of the reconstruction and rehabilitation of the street railway system, which was then and is now owned and operated by the city. Plaintiffs, after the formal necessary allegations of such an action, set up as the vital point of their complaint that the city was without power or authority to issue such bonds, for the reason—

"that the amount of the taxable property in said city of Phoenix, as ascertained by the last assessment for city purposes, is the sum of $49,870,521; that the present outstanding indebtedness of said city of Phoenix is $3,742,500; that said indebtedness is in excess of four per centum of said taxable property; and that said city of Phoenix is without power or authority and is forbidden by section 8, article 9, of the Constitution of Arizona, to become indebted to an amount in excess of four per centum of such taxable property for the purpose set out in this question so by said defendants proposed to be voted on at said special election for the purpose in said question stated. . . . "

Defendants filed a general demurrer to the complaint, which the court, after considering the matter, sustained, and plaintiffs having elected to stand upon their complaint, judgment was rendered that the action be dismissed, and the matter is now before us for review on plaintiffs' appeal.

There are two questions of law involved: First, whether or not the city of Phoenix is forbidden by the Constitution of the state of Arizona from incurring an indebtedness of the character and amount which it is proposed to authorize as aforesaid; and, second, even if it is not expressly so forbidden, has

it affirmative authority granted whereby it may proceed to issue bonds for such purpose? We will consider these questions in their order.

Section 8, article 9, of the Constitution of Arizona, as originally adopted read as follows:

"Sec. 8. No county, city, town, school district, or other municipal corporation shall for any purpose become indebted in any manner to an amount exceeding four per centum of the taxable property in such county, city, town, school district, or other municipal corporation, without the assent of a majority of the property taxpayers, who must also in all respects be qualified electors, therein voting at an election provided by law to be held for that purpose, the value of the taxable property therein to be ascertained by the last assessment for state and county purposes, previous to incurring such indebtedness; except, that in incorporated cities and towns assessments shall be taken from the last assessment for city or town purposes; provided, further, 'that any incorporated city or town, with such assent, may be allowed to become indebted to a larger amount, but not exceeding five per centum additional, for supplying such city or town with water, artificial light, or sewers, when the works for supplying such water, light or sewers are or shall be owned and controlled by the municipality.' "

In 1912 this was amended by adding after the second semicolon the following words:

"Provided, that under no circumstances shall any county or school district become indebted to an amount exceeding ten per centum of such taxable property, as shown by the last assessment roll thereof,"

—and changing the words "five per centum" in the last proviso of the original section to the words "fifteen per centum," and, as so amended, the section is at present a part of the Constitution.

Provisions similar in character, though differing in language, are found in almost all state Constitu-

tions, and their purpose is always the same, to limit the amount of indebtedness which a municipality might otherwise incur through the acts of a corrupt or ignorant governing body, or the negligence and lack of farsightedness of the taxpayers themselves. But, as no two Constitutions have exactly the same language, the specific interpretation will depend upon the general principles of reason applied to the particular proviso.

Our constitutional provision above quoted is reasonably susceptible of two constructions. The first is that the municipality may incur an indebtedness up to four per cent of its assessed valuation for any legitimate city purpose; that all indebtedness of every nature, however incurred, must be charged against the four per cent until that limit is reached; and that so long as the total indebtedness of all classes amounts to four per cent, no increase can be had for any purpose whatever, except for water, artificial light and sewers, and for them only of an additional fifteen per cent and by the assent of the taxpaying electors, thus making the maximum indebtedness for all purposes nineteen per cent of the assessed valuation. A somewhat similar constitutional provision was before the Supreme Court of Montana in the case of *Butler* v. *Andrus*, 35 Mont. 575, 90 Pac. 785, and the construction above set forth followed.

The second is that, while the indebtedness of the city can in no case exceed a total of nineteen per cent it is divided into two separate classes, and the class into which any particular indebtedness must fall is determined by two things—the manner in which it is incurred, and the purpose thereof; that all expenditures for water, light and sewers, authorized by a vote of the taxpaying electors, fall into the fifteen per cent class under all circumstances; that only expenditures which do not possess these two character-

istics are charged to the four per cent class; and that these two separate classes may fluctuate up and down, the one independent of the other, with the sole limitation that the one must not at any one time exceed four per cent while the maximum of the other is fifteen. The Supreme Court of the state of Washington has taken this view of a constitutional limitation of this class in the case of *Austin* v. *City of Seattle,* 2 Wash. 667, 27 Pac. 557.

We are of the opinion that the latter construction is more consonant with reason and the presumable spirit and purpose of our Constitution. The construction first set forth would mean that, should a city incur an indebtedness of four per cent for the special enterprises set forth in the second proviso, it could never become indebted for any other legitimate municipal purpose unless and until the total indebtedness, including that for water, light, and sewer, was reduced below the four per cent. Such a construction would greatly limit and hamper our municipalities in the performance of their legitimate duties. A municipal water plant alone will generally cost more than four per cent of the assessed valuation of a city. That this was realized by the people is shown by the fact that the five per cent additional allowed by the original Constitution was promptly raised to fifteen per cent. If we are to construe section 8, *supra,* in accordance with the first theory, it would mean, in effect, that a city which put in a municipal water plant by that act surrendered the privilege of becoming indebted for any other purpose except lights and sewers; that parks, libraries, sanitary and police protection, and matters of similar nature could only be taken care of out of the current revenue. A city might have incurred an indebtedness up to the four per cent limit for general purposes, and thereafter have voted bonds for a water plant for

fifteen per cent additional. By careful economy it might have used its current revenues to pay off the original bond issue for general purposes, with the idea that it would then be able to proceed with other needed municipal improvements, and still retain its total indebtedness within the nineteen per cent provided by the Constitution. But when it attempted to issue new bonds under such a theory it would be told that the water bonds, which, under the express provisions of the Constitution, were "additional" to the four per cent limit, and not originally included therein, had now by the mere fact of the reduction of the other indebtedness been automatically carried over into the first class and that it could incur no new indebtedness whatever for anything but water, light, and sewers until not only the original bonds issued under the four per cent clause for general purposes, but the vast majority of those issued under the fifteen per cent proviso for the special enterprises had been retired.

We do not think that such a construction is correct, and we hold, therefore, in accordance with the views expressed in *Austin* v. *City of Seattle, supra,* that section 8 of article 9, when applied to municipalities, means that bonds issued by virtue of the proviso allowing such municipalities, with the assent of the taxpaying electors, to become indebted for the special purposes of water, artificial light and sewers, are not to be considered or counted when the question to be determined is whether or not a city has incurred an indebtedness in excess of the general four per cent limitation of the section. Since the complaint of plaintiffs does not disclose whether the indebtedness which it sets up comes within the fifteen per cent or the four per cent proviso of section 8, *supra,* as we have construed it, it did not show on its face

a violation by the city of the constitutional limitation placed on its indebtedness.

The second question is, Admitting for the sake of argument the city was not forbidden by the Constitution to issue the bonds in question, was it nevertheless authorized by law to do so? It is an accepted proposition of law that municipal corporations have no rights, powers or privileges not expressly conferred upon them by law or reasonably implied from their express powers, and in case such as this it is unquestionably necessary that the city be affirmatively authorized by law to issue the bonds. Does such authority exist? Article 13 of the Constitution deals with the organization of municipal corporations. Therein it is provided that any city containing a population of 3,500 "may frame a charter for its own government consistent with, and subject to, the Constitution and the laws of the state . . . " (section 2), and that when said charter is approved by the qualified electors of the city and by the Governor of the state, it shall become the organic law of the city. Said article 13 also provides in section 5 thereof:

"Every municipal corporation within this state shall have the right to engage in any business or enterprise which may be engaged in by a person, firm, or corporation by virtue of a franchise from said municipal corporation."

The city adopted a charter in pursuance of the foregoing provisions, which was duly approved by the Governor, and is still in force. In said charter it was provided that the city should have the right:

"To acquire by purchase, condemnation, or otherwise, and to establish, maintain, equip, own, and operate telephone and telegraph systems, cable, electric, or other railways and transportation service of any kind. . . .

"To borrow money for any of the purposes for which the city is authorized to provide for the carrying out any of the powers which the city is authorized to enjoy and exercise, and to issue bonds therefor; providing that in the procedure for the creation and issuance of such bonded indebtedness the general laws of the state of Arizona, in force at the time such proceedings are taken, shall be observed and followed."

We have held, in the case of *Schultz* v. *City of Phoenix*, 18 Ariz. 35, 156 Pac. 75, construing this charter:

"A city charter enacted by the voters of the municipality is as much a law as if it were enacted by the Legislature."

A somewhat similar provision of the Colorado Constitution has been before the Supreme Court of that state in *City and County of Denver* v. *Hallett*, 34 Colo. 393, 83 Pac. 1066, in which case the court said:

"The purpose of the twentieth article was to grant home rule to Denver and the other municipalities of the state, and it was intended to enlarge the powers beyond those usually granted by the Legislature; and so it was declared in the article that until the adoption of a new charter by the people, the charter as it then existed should be the charter of the municipality, and further that the people of Denver shall always have the exclusive power of making, altering, revising or amending their charter; and further that the charter, when adopted by the people, should be the organic law of the municipality and should supersede all other charters. It was intended to confer not only the powers specially mentioned, but *to bestow upon the people of Denver every power possessed by the Legislature in the making of a charter for Denver.*" (Italics ours.)

The above provisions in the charter of the city are therefore equivalent to an act of the legislature granting the powers set forth therein.

It is true, we held the provision of the Constitution authorizing cities and counties to engage in business was not self-executing, and that it required legislation before it could be put into effect. *Bone* v. *Bowen,* 20 Ariz. 592, 185 Pac. 133. The charter of the city of Phoenix, however, has supplied this necessary legislation, and the city is therefore fully and completely authorized to own, maintain and operate an electric street railway, to borrow money for that purpose, and to issue bonds therefor; the only limitation being that in the procedure for the creation of the debt and issuance of bonds the general laws of the state of Arizona should govern.

Chapter 2 of title 52, Revised Statutes of Arizona of 1913, Civil Code, deals with the question of municipal indebtedness, and we therefore turn to it to see what is required of the city when it attempts to issue bonds under its charter for the maintenance of its municipally owned and operated street railway. The first part of the chapter deals with the method of issuing bonds in excess of the four per cent limit, and so does not of itself apply to a bond issue which must be within that limit. Paragraph 5285 of said chapter, however, reads in part as follows:

"Nothing in this chapter contained shall be construed to prevent any county, school district, city, town, or other municipal corporation from creating an indebtedness not exceeding four per centum of the value of the taxable property in such county, school district, city, town, or other municipal corporation; provided, that if such county, school district, city, town or other municipal corporation shall desire to fund such indebtedness by the issuance of bonds therefor, said bonds shall be issued in all respects in conformity with the provisions of this chapter, and, provided, further, that it will not be necessary to hold the election required to be held herein; provided, that bonds may be issued under the provisions of this chapter, for the construction and reconstruc-

tion of roads, bridges and highways; for the construction of public buildings, and for any other lawful or necessary purpose. The enumeration of the above mentioned purposes shall not be deemed as restrictive of the right to issue bonds for other purposes, but rather in furtherance thereof. . . . ''

This paragraph has been before us for construction in the case of *Board of Supervisors* v. *Hawkins,* 16 Ariz. 16, 140 Pac. 821. In discussing the paragraph we said:

''When it is considered that chapter 2 throughout treats of the creation of indebtedness by municipalities and the method and manner of evidencing such indebtedness as it is incurred, it may be that it was intended that the expression 'that if such county . . . shall desire to fund such indebtedness by the issuance of bonds therefor' should be construed to mean that bonds could be issued as the original or first evidence of the liability incurred and not the funding of a floating or outstanding debt.''

The court held, however, that it was not necessary to determine whether the first part of the paragraph applied for the reason that the last part expressly allowed bonds of the character in question in that case to be issued when authorized by an election. As will be seen, in addition to the provision for refunding, the paragraph states:

''That bonds may be issued, under the provisions of this chapter for the construction and reconstruction of roads, bridges, and highways; for the construction of public buildings, *and for any other lawful or necessary purpose. The enumeration of the above-mentioned purposes shall not be deemed as restrictive of the right to issue bonds for other purposes, but rather in furtherance thereof.*'' (Italics ours.)

Bonds of the character in question herein being for a lawful purpose, as we have shown above, the general provisions of chapter 2, title 52, *supra,* fur-

nish a legal and complete method whereby the city can issue them. To sum up, we hold (1) that, under section 8, article 9, Constitution of Arizona, in determining whether or not a municipality has incurred an indebtedness in excess of four per centum of its assessed valuation any indebtedness incurred for water, artificial lights and sewer, by and with the assent of a majority of the qualified electors who are property taxpayers, should not be considered; (2) that the city of Phoenix, by virtue of article 13 of the Constitution of Arizona and its charter duly adopted in pursuance thereof, is authorized to own, maintain and operate a street railway, and to borrow money and issue bonds for such purpose, so long as its total indebtedness computed as above set forth does not exceed four per centum of its assessed valuation; and (3) that, since the charter of the city of Phoenix has provided that bonds issued by the city shall be issued as provided by the general laws of the state of Arizona, the proper procedure to be followed is that set forth in the provisions of title 52 of said Civil Code of 1913.

Since plaintiffs' complaint failed to show affirmatively that the four per cent limit of indebtedness would be exceeded by the issuance of the bonds in question, and, since it does show affirmatively that the election against which an injunction was sought has been called in full conformity with the law if such limit is not exceeded, the trial court properly sustained the demurrer, and rendered judgment dismissing the action.

Judgment affirmed.

ROSS, C. J., and McALISTER, J., concur.