This is an action brought under the provisions of section 3405, Revised Code of Arizona, 1928, for the purpose of determining the validity of certain bonds issued by the Verde irrigation and power district. Judgment was rendered in the superior court of Maricopa county declaring the bonds in all respects valid obligations of the district, and the matter has been brought before us for review. The suit is one of the type frequently appearing in this court of late years, where all the nominal parties are anxious that the bonds should be declared valid. *Page 582 
The usual process is that the proceedings are carefully examined by the attorneys for the parties, and by agreement counsel collaborate for the purpose of presenting to the court every question they think might be raised by a future intending purchaser of the bonds.
The petition herein set up the various proceedings had by the district relative to its organization, and the authorization of the bonds in question. The nominal appellant, who was a land holder and elector in the district, filed a demurrer thereto, and the court proceeded to hear the matter upon both the law and the facts. It is stipulated by counsel that the petition correctly alleges, for the most part in their chronological order, the various steps taken in the organization of the district and the authorization of the bond issue.
There are some eight assignments of error, and we shall consider the various questions of law raised thereby in their order. The first is that the court was without jurisdiction to adjudicate and define the boundaries of the district, and the lands therein to be subject to the costs and burdens of the proposed bond issue. The authority to maintain this suit is found in section 3405, supra. The language of that section, so far as it refers to the question under discussion, reads as follows:
"Such judgment may determine the legality and validity of, and approve and confirm, each and all of the proceedings, of the organization of said district under the provisions of said article, from and including the petition for the organization of the district, and all other proceedings which may affect the legality and validity of said bonds. The court, in inquiring into the regularity, legality or correctness of said proceedings, must disregard any error, irregularity or omission which does not affect the substantial rights of the parties." *Page 583 
This is a special and limited proceeding, and the jurisdiction of the court therein is no broader than the statute which created the proceeding. We are of the opinion that under the language of the section the court is authorized to pass upon any question which may affect the legality and validity of the bonds. If it be necessary in order to determine their validity that the court define the boundaries of the district, this may be done. If, on the other hand, it is not necessary, the court is without jurisdiction to make such definition. Is it necessary, therefore, in order that the validity of the bonds be determined, that the court should decide just what the area of the district is now, or was at any particular time?
We are of the opinion it is necessary, so far as the land included in the district at the time of the election is concerned. Since the right to vote upon bonds in a district of this nature depends, among other things, upon whether the voter is the owner of lands within the district, we think it was necessary for the court to determine its boundaries and what land was included therein. It therefore had jurisdiction to make such determination.
The first proceedings for the organization of the district were in January, 1918, when a petition was filed with the board of supervisors of Maricopa county, Arizona, under the provisions of chapter 8, 2d Special Session Laws of Arizona 1915. The subsequent proceedings were regular in all respects, and the district was finally legally organized with certain definite lands included therein, under the name of the "Paradise Verde Irrigation District." Thereafter, and in April, 1922, the board of directors of the district caused a new survey for its main canal to be made along a line some distance north of the line as originally surveyed. Shortly prior to August 25th of that year several claimants to land lying between those survey lines filed with the board of directors *Page 584 
a number of petitions similarly worded, requesting that the land described therein be included within the boundaries of the district. Each petition was for individual lands, and not for the inclusion of the entire area of the so-called "north strip" as a unit. Together they were signed by the claimants to some 3,900 acres of land, only 168 acres of which was then patented. The board of directors, upon the petitions being filed, held a meeting and adopted a resolution that the necessary steps be taken for the inclusion of the entire north strip, and on October 3, 1922, a resolution was passed attempting to include all the lands of such north strip within the district.
Of the lands embraced in the strip, and so attempted to be included, 3,156 acres were then owned by the United States government, 3,088 by the state of Arizona, and 634 were patented lands in private ownership. Under the provisions of section 26A, chapter 36, Special Session Laws of 1922, it was necessary that the state land commissioner sign a petition for inclusion of the state lands, and by federal statute (43 U.S.C.A., § 623) the consent of the Secretary of the Interior was required for the inclusion of lands of the United States. No petition was ever made by the state land commissioner for the inclusion of the state lands, and the Secretary of the Interior never approved of the inclusion of the lands of the federal government, but on the contrary expressly disapproved thereof.
There were then two methods of including additional lands within an irrigation district, one being section 26 of chapter 149, Session Laws of 1921, applying to separate parcels of land, and the other section 26A, supra, covering a general body of lands owned by different persons. These sections, so far as they are material, read as follows: *Page 585 
"Section 26. (a) For the purpose of determining the permanent inclusion of any additional lands within the district, and for the purpose of determining as to the question of excluding from the district any lands which may not be susceptible of irrigation from the works thereof or for excluding lands which may be nonirrigable in character, petitions for such purposes may be made by the owners and filed with the board of directors, which petitions shall give the description of the lands to be affected, and stating the action desired and the reasons for such requested action. Such petitions shall be sworn to by the petitioner. At the time of filing such petition there shall be paid to the secretary an amount sufficient to cover the estimated expenses of publication of notice and hearing thereof." Chapter 149, Session Laws 1921.
"Section 26A. The holder or holders of title or evidence of title representing a majority of the acreage of any body of land adjacent to the boundaries of any irrigation district may file with the board of directors of said district a petition in writing praying that such lands be included in such district. The petition shall describe the tracts or parcels of land proposed to be included. Such petition shall be deemed to give assent of the petitioners to the inclusion in said district of the lands owned by them, and said petition must be acknowledged by one or more of the signers thereof. In the event state lands being petitioned to be included the state land commissioner may sign said petition on behalf of the State of Arizona and state lands shall not be included in any district nor subject to irrigation district laws except such a petition is made by the Land Commissioner, and in no event shall state lands become encumbered for any debt, obligation or liability of any such district." Special Session Laws of 1922, chap. 36.
The petitions are a jurisdictional prerequisite to any action of the board of directors, and it is evident from the facts above stated that the petitions filed would not authorize the inclusion of any state or federal lands within the district, nor indeed of anything except the specific lands owned by the individual petitioners, *Page 586 
under section 26, supra. Notwithstanding this the board of directors proceeded on the theory that they were sufficient to give it jurisdiction to include the whole north strip, under section 26A, supra. We are of the opinion that under these circumstances the action of the board in attempting to add the so-called "north strip" was without jurisdiction, and utterly void. Since it was never legally included we need not consider whether it was properly excluded.
The third question is as to whether or not the exclusion of certain lands from the district by order of the board of directors on September 12, 1929, was legal. We are of the opinion that this is immaterial. The bonds were authorized by a vote of the electors of the district as it existed on the seventh day of August, 1923, and their validity, so far as the action of the electors is concerned, depends upon the situation as it existed at that time. If the lands in question were legally within the district at the time of the election, it would be immaterial as to whether they have since been legally excluded or not. Such a question might affect the marketability of the bonds as going to the extent of the security back of them, but it could not affect their validity.
The fourth question is whether or not the fact that the notice of bond election stated that the election would be held "between the hours of 6 A.M. and 6 P.M." of the day of the election, while the statute provided that at such elections "the polls must be opened at 8 o'clock A.M. and remain open until 6 o'clock P.M. of the same day" [Laws 1921, chap. 149, § 18 (e)] is material. We are of the opinion that this is at most an irregularity which would in no way affect the validity of the bonds. Had the election notice given a shorter time for the polls to remain open than that fixed by the statute, and had the polls by reason thereof remained open only such shorter *Page 587 
time, it might perhaps be argued that qualified electors sufficient in number to have changed the result of the election were prevented from voting, but since the only effect of the notice, if any, was to keep the polls open longer than provided by the statute, unless it appears that as a result of such fact unqualified persons succeeded in voting, the irregularity was harmless. Davy v. McNeill et al., 31 N.M. 7, 240 P. 482;State ex rel. Amick v. Francisco, 98 Kan. 808, 160 P. 217; 44 C.J. 1207.
The fifth question arises out of the following statement of facts: The notice for the bond election and the ballots used at such election describe the proposed bonds as "maturing thirty years from the time of issuance." The statute then in force provided that:
"The said bonds shall mature in such manner that a certain percentage thereof, which shall not be less than five per cent. (5%) shall be payable at the expiration of each of the eleventh to the thirtieth years after the date of issue, both inclusive, until all thereof shall have been paid, provided however, that no percentage of said bonds in excess of ten per cent (10%) shall be paid at the expiration of any one of said years, and that none thereof shall be payable prior to the expiration of eleven years from the date of issue thereof. . . ." (From section 11, chapter 36, Special Session Laws of 1922.)
It is urged that since the description of the maturity of the bonds on the notice and ballot departed so greatly from the mandatory provisions of the statute the electors cannot be held to have assented to the issuance of the bonds on the terms on which by statute they must be issued, if at all.
Chapter 36, Session Laws of 1922, supra, which governed at the time the bond election was held, after setting forth the preliminary method whereby the board of directors of an irrigation district should prepare for a bond issue, provides: *Page 588 
"Immediately after the adoption of its said resolution so determining the amount of bonds, the board of directors shall call a special election at which shall be submitted to the Electors of said district the question whether or not the bonds of said district in said amount shall be authorized."
The law then continues to the effect that notice shall be given in a certain manner of the election, and that:
"Such notices must specify the time of holding the election, the amount of bonds proposed to be issued, . . . provided, that no informalities in conducting such election shall invalidate the same, if the election shall have been otherwise fairly conducted. At such election the ballot shall contain the words: `Bonds — Yes,' and `Bonds — No,' or other words equivalent thereto."
It will be seen in the first place that the only question upon which the electors of the district are to pass is whether the bonds of the district in a specified amount shall be authorized. The description, character and maturity of the bonds is not left to them, but is fixed definitely by statute, and the electors of the district were charged with notice of the statute. The notices must specify the time of holding the election and the amount of bonds to be issued, and the ballot must contain certain words; but there is no provision for either such notice or ballot containing anything else. Were it alleged and proved that the error in the notices misled the electors so as to change the result of the election, it might be there would be some merit in the objection. But in the absence of such proof we are of the opinion that the provisions in regard to the maturity of the bonds thus placed on the notices and ballot without authority of law are to be considered as surplusage and a mere irregularity which does not invalidate the bonds. Board of Directors, etc., v. Peterson, 64 Or. 46, 128 P. 837, *Page 589 
129 P. 123; State v. Salt Lake City, 35 Utah 25, 18 Ann. Cas. 1130, 99 P. 255; City of Santa Barbara v. Davis,6 Cal.App. 342, 92 P. 308; 44 C.J. 1208.
We think the case of City of Amarillo v. Slayton Co., (Tex.Civ.App.) 208 S.W. 967, 970, cited by appellant, is distinguishable on the facts from the one at bar. In that case the city of Amarillo had sold certain bonds subject to the approval of the attorneys for the purchasers. The Texas statute (Rev. Stats. 1911, art. 606) under which the bonds were issued provided:
"The proposition to be submitted for the issuance of bonds shall distinctly specify the purpose for which the bonds are to be issued, the amount thereof, the time in which they are payable, and the rate of interest."
Nor was there any statute specifically fixing the period of redemption or the time within which the bonds should be paid. The purchaser refused to take the bonds on the advice of his attorney, and the Supreme Court of Texas said:
"We think . . . the question raised by him presented a serious question, and one which a cautious attorney would not treat lightly or advise his client to disregard. Whether he was correct or not, or whether the courts would finally uphold the issue of the bonds or not, the objection was not trivial or unreasonable."City of Amarillo v. Slayton Co., supra.
And it was held the sale of the bonds could not be enforced.
It will be observed that under the Arizona statute the time of redemption and the date within which the bonds are payable are not left optional to the electors, but are fixed by statute. Such being the case, the rule laid down by the Supreme Court of Texas is in no way in conflict with the one we have stated. The *Page 590 
various cases cited in City of Amarillo v. Slayton Co.,supra, are equally distinguishable in principle from the present one.
The sixth question is similar in substance to the fifth, going as it does to the difference in the date of maturity of the bonds as issued, and that provided in the notices. We think the same principles which we have laid down above apply here. The bonds issued by the directors were in strict conformity with the statute.
The seventh point raised is that too great a length of time elapsed between the election at which said bonds were authorized and the date of the decree of the lower court validating them, it being a period of some seven years. The ordinary rule is that unless the statute requires bonds to be issued within a specified period of time after the election at which they were authorized, the time of issuance rests in the sound discretion of the officials upon whom that duty is imposed. Stokes v.Montgomery, 203 Ala. 307, 82 So. 663; Covington v.McInnis, 144 S.C. 391, 142 S.E. 650; 44 C.J. 1207. The petition shows a reasonable excuse for the delay, and the facts set up regarding the delay were found to be true by the trial court. There is no merit in the seventh objection.
The eighth objection is that the court erred in decreeing that the bonds in question were eligible to certification by the state auditor. It is not contended that the proceedings leading up to this certification were not strictly in accordance with the language of the statute. The only objection raised is that too great a time has elapsed since the findings of the certification. These findings were made December 10, 1924. The statute (Rev. Code 1928, § 3420) does not limit the time after which they are made within which the auditor is to certify the bonds, and we cannot add to the terms of the statute. *Page 591 
This covers all the objections raised on the appeal. We are of the opinion that at most they present certain irregularities which in no way affect the validity of the bonds.
For the foregoing reasons the judgment of the superior court of Maricopa county is affirmed.
McALISTER, C.J., and ROSS, J., concur.
 *Page 1