[Civil No. 3510.   Filed June 25, 1934.]

[33 Pac. (2d) 927.]

W. L. ALLISON, Appellant, v. CITY OF PHOENIX, a Municipal Corporation, FRED J. PADDOCK, R. E. PATTON, CHESTER A. SIPES, J. B. GUESS and LESTER DeMUND, City Commissioners of the City of Phoenix, OLIVER H. LOCH, City Treasurer of the City of Phoenix, and L. W. ROWLES, City Clerk of the City of Phoenix, Appellees.

Mr. W. L. Barnum, for Appellant.

Mr. Frank H. Lyman, City Attorney, for Appellees.

LOCKWOOD, J.—This is a proceeding by W. L. Allison, hereinafter called plaintiff, as a real property taxpayer and elector of the city of Phoenix, to enjoin the city and its proper authorities from issuing, selling or delivering any of certain bonds authorized by Ordinance 1874 of that city.

The complaint was filed in the superior court of Maricopa county and a demurrer interposed, which was by the court sustained, and plaintiff electing to stand on his complaint, judgment was rendered in favor of the defendants, whereupon this appeal was taken.

There were four separate bond issues provided for by the ordinance, and separate suits were filed in the superior court to test the validity of each issue; but since the cases were by stipulation briefed as one, we shall discuss in this case every objection raised to any of the bonds, and the views we express in this case will in effect determine the result of the other three appeals.

We must take the facts stated by the complaint as true for the purpose of the appeal, and therefore briefly summarize them as follows: Pursuant to the program instituted by the United States of America to relieve distress and unemployment in the United States, the city commission of the city of Phoenix, endeavoring to co-operate with such program, decided to submit to the properly qualified electors of said city, who were also real property taxpayers therein, the question as to whether the city should issue bonds for certain purposes. These purposes were: (a) To develop within and without the territorial limits of the city a system of parks, playgrounds, and recreational areas; (b) to construct extensions to the sanitary sewer system of the city of Phoenix; (c) to construct a municipal storm sewer; and (d) to construct extensions to the municipal water system of Phoenix. These questions were submitted at an election held

on December 9, 1933, in such manner that they might either approve or reject each of the proposed bond issues separately. The ordinance authorizing such election provided that the bonds should be paid as provided by article 5, chapter 60 of the Revised Code of 1928 (section 2657 et seq.'), and any amendment thereto, but that in addition thereto all of the net revenue to be derived by the city from certain property owned and to be owned by it should be put into a special fund and used for the purpose of paying the interest and principal of the park bonds, and the property tax required by article 5, *supra,* to be levied for the payment of such bonds should be reduced by the amount of money so placed in the special fund, as aforesaid. It further provided that the city had an agreement with the United States of America whereby the latter would purchase said bonds, on condition that the city would pass an ordinance appropriating the surplus net revenues derived from the operation of the sanitary sewer and water extensions, above referred to, for the repayment of said bonds. All these provisions in regard to the special funds aforesaid were by the ordinance required to be shown upon the face of the proper bonds, if, as, and when issued. The bonds were all approved by a small but sufficient majority. Thereafter these suits were brought.

While in form they are by an objecting taxpayer who desires to have the bonds declared invalid, it is obvious from the record, and the manner in which it has been presented, that it is in reality, as we said in *Re Verde etc. Irr. Dist.,* 37 Ariz. 580, 296 Pac. 804, a friendly suit in which all of the parties are desirous of having this court declare that the bonds will be valid obligations of the city of Phoenix if, as, and when issued. The plaintiff in his brief has set up five matters which he alleges show that the bonds are invalid, but apparently in fear that the court

may inadvertently fail to realize the fallacy of his objections, he has carefully pointed out in his brief the reasons why these objections are untenable, and cited authorities to that effect, without presenting either argument or authority in support of the objections. The situation is similar to that which has almost invariably occurred when bond validation suits have been before us in the past, and we have therefore been forced, in order that the questions raised should be fairly considered, to act as counsel for the plaintiff, to the extent of making an independent investigation to determine whether there is reason or authority to sustain the formal objections made by him.

We shall consider the five objections in the order in which they are stated in the brief. The first is that the issuance of the $720,000 of park bonds would increase the indebtedness of the city of Phoenix in excess of 4 per cent. of its assessed valuation. Section 8, article 9, Constitution of Arizona, reads as follows:

"Section 8. No county, city, town, school district, or other municipal corporation shall for any purpose become indebted in any manner to an amount exceeding four per centum of the taxable property in such county, city, town, school district, or other municipal corporation, without the assent of a majority of the property taxpayers, who must also in all respects be qualified electors, therein voting at an election provided by law to be held for that purpose, the value of the taxable property therein to be ascertained by the last assessment for State and county purposes, previous to incurring such indebtedness; except, that in incorporated cities and towns assessments shall be taken from the last assessment for city or town purposes; 'Provided, that under no circumstances shall any county or school district become indebted to an amount exceeding ten per centum of such taxable property, as shown by the last assessment roll thereof;' and provided, further, 'that any incorporated city or town, with such assent, may be allowed

to become indebted to a larger amount, but not exceeding fifteen per centum additional, for supplying such city or town with water, artificial light, or sewers, when the works for supplying such water, light or sewers are or shall be owned and controlled by the municipality.' "

We have held in the case of *Buntman* v. *City of Phoenix*, 32 Ariz. 18, 255 Pac. 490, that, under this provision, indebtedness for water, light or sewer purposes is in a separate class from that incurred for any other purpose, and that in determining the total amount of indebtedness allowed, the two classes must be considered separately. The total valuation of the city of Phoenix, as shown by the last assessment before the bond election, was $65,879,213. This would permit a total indebtedness, other than that for water, light and sewer purposes, of $2,635,168. The actual indebtedness already incurred at the time of the election, excluding the three purposes last named, was $1,679,051, leaving a margin of $956,117, for which new indebtedness for purposes other than water, light and sewer might, under the constitutional provision, be incurred. The city, in addition to the indebtedness already outstanding, as aforesaid, had from time to time issued bonds in large sums for the construction of waterworks, and at times when some of these bonds fell due it was unable to pay the principal, and had therefore issued a total of $278,000 of bonds to refund such indebtedness. It is contended that this $278,000 of refunding bonds is in reality an indebtedness which must be charged against the 4 per cent. limit for general purposes, and not against the 15 per cent. limit for water, light and sewer, against which last limit the bonds which the $278,000 of refunding bonds replaced were originally charged. If this must be charged against the $956,117 above referred to, obviously there is not a sufficient margin left to take care of the $720,000

park bonds which, of course, must be charged against the 4 per cent. limit. If, on the other hand, the refunding bonds are to be charged against the 15 per cent. limit in the same manner as the bonds in lieu of which they were originally issued, sufficient margin still remains under which the 4 per cent. limit will care for the park bonds, with a considerable amount over.

A similar situation has arisen in many cities which have the unfortunate habit of issuing bonds which all mature at the end of a fixed period, and are presumably, although almost never actually, to be cared for by a sinking fund, instead of serial bonds on which a certain percentage of the principal must be paid year by year; the bonds thus being fully paid by the time of maturity. It is almost universally held that an issuance of refunding bonds in this manner does not create any debt or increase the debt of the municipality which issues them. They merely change the form of an existing indebtedness.

In the case of *Citrus G. D. Assn.* v. *Water Users' Assn.*, 34 Ariz. 105, 268 Pac. 773, 780, a similar question arose. It was urged in that case that the refunding bonds issued by the Water Users were an increased indebtedness within the meaning of a charter provision limiting the amount of indebtedness, as does our constitutional provision. Therein we said:

" . . . It is the universal rule that where a municipality issues new securities and exchanges them directly for old ones, or in the payment of a valid existing indebtedness, the transaction is not an increase within the meaning of constitutional and statutory provisions, since the new securities as soon as issued extinguish the old debt, and therefore the aggregate outstanding indebtedness is the same at all times. *Maish* v. *Arizona,* 164 U. S. 599, 17 Sup. Ct. 193, 41 L. Ed. 567; *Mitchell* v. *Smith,* 12 S. D. 241, 80 N. W. 1077; *Los Angeles* v. *Teed,* 112 Cal. 319,

44 Pac. 580; *Butler* v. *Lewiston,* 11 Idaho 393, 83 Pac. 234.''

See, also, *City of Huron* v. *Second Ward Savings Bank,* (C. C. A.) 86 Fed. 272, 49 L. R. A. 534; *Veatch* v. *City of Moscow,* 18 Idaho 313, 109 Pac. 722, 21 Ann. Cas. 1332; *Marion County* v. *Harvey County,* 26 Kan. 181; *County of Jasper* v. *Ballou,* 103 U. S. 745, 26 L. Ed. 422. We hold, therefore, that the $278,000 of refunding water bonds should not be charged as an indebtedness under the 4 per cent. limit, and that the objection that the $720,000 park bonds will increase the debt of the city of Phoenix, in contravention of section 8, article 9, *supra,* is not well founded.

The second objection is that the ordinance in question provides that any funds which may be available to the city from the lease or sale of certain of its property may be used to pay the interest and principal of the bonds in question, and that it shall be so stated on the face of the bonds. We have held in *Buntman* v. *City of Phoenix, supra,* construing the charter provision of the city of Phoenix in regard to the manner in which the bonds of the city are to be issued and paid, that they must comply with the state law on that subject. Chapter 2, title 52, Revised Statutes of Arizona 1913 (Civil Code 1913, par. 5266 et seq.), covered this subject fully and it was re-enacted in substance as article 5, chapter 60 of the Revised Code of 1928 (section 2657 et seq.), which was in force at the time the bonds in question were voted. Sections 2664 and 2677, Revised Code of 1928, which are a part of article 5, *supra,* read as follows:

''§ 2664. Tax levy to pay interest and bonds. After said bonds are issued the board of supervisors for any county or school district and the governing body for any town or municipal corporation, shall enter upon their minutes, a record of the bonds sold, their numbers and dates, and annually levy and

cause to be collected a tax, at the same time and in the same manner as other taxes are levied and collected upon all taxable property in such political subdivisions, sufficient to pay the interest on same when due; and likewise, annually, levy a tax sufficient to redeem said bonds when the same shall mature. All money derived from the levy of the tax when collected, shall constitute a fund for the payment of such interest and the bonds, to be kept separately and to be known as the 'Interest Fund' and 'Redemption Fund.' ' '

"§ 2677. . . . Bonds may be issued under the provisions of this article for any lawful or necessary purpose."

We are of the opinion that section 2664 is mandatory and binding upon all parties mentioned therein, and that they must levy and cause to be collected a tax for the payment of bonds issued under such article, in the manner provided by such section. Does the provision of the ordinance that money shall also be provided in another way to meet the bonds, and that such provision shall appear on the face of the bonds, affect their validity? Section 2661, Revised Code of 1928, reads as follows:

"§ 2661. Voting bonds; call for election; interest. Whenever such political subdivision desires to issue bonds or other evidences of indebtedness the governing body or board thereof may, with the assent of a majority of the property taxpayers who are qualified electors therein voting at said election given in the manner provided in the two preceding sections, issue and sell its bonds in the amount of indebtedness authorized at said election; provided that the call for said election shall set forth the amount of each and the aggregate of said bonds, the rate of interest to be paid thereon, not exceeding six per cent per annum, when such interest shall be paid, the date of maturity of said bonds, and the purposes for which the money derived from the sale of such bonds shall be expended."

It will be seen that the call for the election, made in this case by Ordinance 1874, is required to contain certain specified matters, but among these is *not* a provision as to how the funds to pay the bonds shall be raised. That is expressly set forth in section 2664, *supra*. The question of manner of payment could not, therefore, have been legally submitted to the voters, and the call to that extent was illegal. But does this necessarily render the bonds invalid? It is generally held that where the statute requires the call to contain certain provisions, an omission of any of the substantial requisites will in a direct proceeding to prevent the issuance of the bonds make them void. *Warren County* v. *Marcy,* 97 U. S. 96, 24 L. Ed. 977; *Hicks* v. *Krigbaum,* 13 Ariz. 237, 108 Pac. 482. But when the statutory requirements are followed, the municipal authorities cannot require anything else in the notice. *Hamilton* v. *Village of Detroit,* 83 Minn. 119, 85 N. W. 933. A situation almost precisely similar to that involved in the present case arose in *State* v. *Salt Lake City,* 35 Utah 25, 99 Pac. 255, 259, 18 Ann. Cas. 1130. The statute there, as here, provided that an annual tax be levied to pay the interest and sinking fund of the bonds, while the call submitted to the voters, as here, provided for the establishment of a special fund raised from other sources. Therein the court said:

" . . . The question, however, whether the bonds shall be paid by one method or another is not a question to be submitted to the voters. The same statute which requires the voters' consent to the creation of the debt, also provides how the debt shall be met in case it is authorized. While the taxpayer may withhold his consent to the creation of the indebtedness, he cannot express his choice with regard to the manner of its payment, nor upon the method by which the funds necessary therefor shall be obtained. This method is fixed by the statute, which provides that a tax shall be levied annually sufficient in amount to

pay the interest and to create a sinking fund for the payment of the principal when it matures. Prudence requires that, when a public debt is created, adequate provision for its payment be made. The Legislature, in granting the power to municipalities to raise funds by the issuing of bonds for public improvements, was unwilling to leave the matter of providing the funds for the payment of the interest and principal of the debt to the mere judgment of the city officials. It was, therefore, by a positive enactment provided that an annual tax be levied sufficient in amount to meet both the interest and principal, as either becomes due. To do this, no doubt, was deemed safe, and hence it was made obligatory upon the city officials to levy such a tax. The very act, therefore, which conferred the right upon the taxpayer to either give or withhold his consent to incur the obligation, also requires him to adopt the method prescribed for the payment of the obligation after it is created. The taxpayer thus cannot authorize, nor can the city officials issue, bonds without adopting the statutory method of payment. . . .

"But if we should assume that the statement was in the nature of an inducement to the voters of which they may complain, then it constitutes what is termed an irregularity. It certainly cannot be said to be more than this. And as we have seen, it is not a matter that could have been submitted to a vote or voted upon at the election. Nor was it an irregularity in the proceedings, either before or at the election. It, therefore, was a matter which, if it had any effect at all, must be considered in the nature of an inducement to the voters to vote for the bonds. But there is no allegation or intimation even that any of the voters were in fact induced to vote for the bonds that otherwise would not have voted for them. Can an election be declared illegal because of some irregularity which it is not claimed affected the result thereof? The mere allegation that an irregularity occurred is not sufficient to authorize a court to declare the election illegal. If the matter complained of were one which in a sense were jurisdictional—that is, which went to the right of holding

the election, or to its legality—the case might be different.

"It is also conceded by the plaintiff that the bonds in question are issued in strict conformity with the statute, and that they contain a recital that both the payment of the interest and principal will be provided for as required by the statute, and not in accordance with the statement contained in the notice. The bonds, therefore, seem to be in conformity to law. We can discover no reason, therefore, which would authorize us to prohibit the disposal of the bonds. . . . "

See, also, *Cowan* v. *City of Tucson*, 24 Ariz. 330, 209 Pac. 296.

It is true that one of the judges in the case of *State* v. *Salt Lake City, supra,* held that if it had been pleaded and proved that enough voters were misled by the erroneously included matter to have changed the result of the election a different situation would have arisen, but since there was no contention in the complaint that the voters were misled by this provision in the call, we think it did not invalidate the bonds, but was mere surplusage, which should be disregarded entirely if the bonds are issued and sold. We do not wish to be understood as holding that the city of Phoenix may not legally use any funds other than that raised by a property tax, as provided by section 2664, *supra,* towards the payment of the bonds in question. On the contrary, if any money from any source is legally available for that purpose, it may from time to time be transferred to the interest and redemption funds created by the statute. But the bonds cannot be, and are not based, in whole or in part, on anything but the statutory method of repayment.

The third objection raised is that some of the funds from the sale of the park bonds will be used in buying land for park and recreation areas outside the boundaries of the city. Subdivisions (a) and

(e) of chapter II of the Charter of Phoenix, which state various powers of the city, read in part as follows:

"(a) To acquire by purchase, condemnation, or otherwise, and to establish, maintain, equip and own . . . parks, playgrounds and places of recreation . . ."

"(e) To acquire by purchase, condemnation, or otherwise, within or without the city, such land as may be necessary for the establishment, maintenance and operation of any public utility, or to provide for and effectuate any other public purpose . . ."

We think it clear that by section (a), *supra,* the city is authorized to acquire parks, playgrounds and places of recreation, which are unquestionably for public purposes, and by section (e) it is authorized to acquire land and property, either within or without the city, for *any* public purpose. No clearer expression of authority to purchase ground for park purposes outside of the city limits could be asked. The objection is not well founded.

The fourth objection is that by the terms of the ordinance certain persons authorized by the Constitution of Arizona to vote on the issuance of these bonds were prohibited from doing so. Section 8, article 9, *supra,* contains the following:

"Section 8. No county, city, town, school district, or other municipal corporation shall for any purpose become indebted in any manner to an amount exceeding four per centum of the taxable property in such county, city, town, school district, or other municipal corporation, without the assent of a majority of the *property taxpayers,* who must also in all respects be qualified electors, therein voting at an election provided by law to be held for that purpose. . . ." (Italics ours.)

At the time of the adoption of the Constitution, section 13 of article 7 thereof read as follows:

"Section 13. Questions upon bond issues or special assessments shall be submitted to the vote of *property tax-payers,* who shall also in all respects be qualified electors of the State, and of the political subdivision thereof affected by such question." (Italics ours.)·

Thereafter, and at the general election held in 1930, the people of the state of Arizona approved an amendment to said section so that from the 1st day of December, 1930, it read as follows: "Section 13. Question upon bond issues or special assessments shall be submitted to the vote of *real ·property tax payers,* who shall also in all respects be qualified electors of this state, and of the political subdivision thereof affected by such question" (italics ours), being amended by adding the word "real" in front of the word "property." It is the universal rule of constitutional and statutory construction, so well known as to need no citations in support thereof, that a later enactment prevails over any earlier one of equal rank, in so far as the two are in conflict. When, therefore, the people in 1930 amended section 13, *supra,* to provide that all questions upon bond issues should be submitted only to *real property* tax-payers instead of *property* taxpayers as previously, this superseded the earlier provisions of section 8 of article 9, authorizing the submission of bond issues to the property taxpayers, regardless of whether such property was real or personal.

The fourth objection to the validity of the bonds is not good.

The last objection is that the alleged agreement with the United States government, that an ordinance should be adopted pledging certain revenues of the city to be placed in special interest and redemption funds to pay the water and sewer bonds, is contrary to the provisions of article 5 of chapter 60, *supra.* We think the same ruling applies in principle as was

made on the second objection. The bonds were legally authorized for a specific purpose, and both the statute and the ordinance require that a tax should be levied under article 10 sufficient to pay the interest and principal thereof. If the city is authorized to enter into an agreement with the United States of America of the kind referred to, and special funds are set aside to assist in the payment of the bonds, the amount required to be levied under section 2664, *supra,* will be lessened. If, on the other hand, such an agreement cannot legally be made, the only difference would be that a heavier property tax must be levied. Their repayment, however, is guaranteed only under the terms of section 2664, *supra,* and their validity as obligations of the city of Phoenix would be the same in either case.

We have considered carefully and at length all of the objections made in this case to the issuance of the bonds in question. We are of the opinion that none of the objections presented to us are well founded, and that, so far as they are concerned, the bonds are valid. Since the pleadings were submitted to the trial court upon these objections, and on these alone, it properly sustained the demurrer to the complaint, and on plaintiff's refusing to amend, rendered judgment for the defendants.

The judgment is affirmed.

ROSS, C. J., and McALISTER, J., concur.