# MAISH *v.* ARIZONA.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF ARIZONA.

No. 89.   Submitted October 29, 1896. — Decided December 21, 1896.

In proceedings in Arizona to enforce the collection of taxes assessed upon real estate, a printed copy of the delinquent list, instead of the original filed in the office of the county treasurer, was offered in evidence. To the introduction of this objection was made, but not upon the ground that the original was the best evidence, or that the copy offered was not an exact copy. In this court it was for the first time objected that the list, as filed in this case, was not a copy of the original. *Held,* that this court would not disturb the judgment of the court below on such technical grounds, apparently an afterthought.

For the hearing of the objections of the appellants against the assessment of the tax the court convened on the 14th of March. The notice published by the tax collector was that the sale would begin on the 20th of March. On March 15 a judgment was entered directing the sale on the 20th of all the property, to which no objection had been filed. As to those parties making objections (and included among them were the present appellants) the case was set down for hearing at a subsequent day, and a trial then had; but the judgment was not entered until the 7th day of May, 1892, and the order was to sell on the 13th day of June. *Held,* that the purpose and intention of the act being the collection of taxes, but only of such taxes as ought to be collected, and judicial determination having been invoked to determine what taxes were justly due, the fact that the court took time for the examination and consideration of this question did not oust it of jurisdiction.

In Arizona the delinquent tax list is made by law *prima facie* evidence that the taxes charged therein are due against the property, as well the unpaid taxes for past years as those for the current year.

It was the intention of the legislature of Arizona, and a just intention, that no property should escape its proper share of the burden of taxation by means of any defect in the tax proceedings, and that, if there should happen to be such defect, preventing for the time being the collection of the taxes, steps might be taken in a subsequent year to place them again upon the tax roll and collect them.

The testimony does not sustain the contention that the board of equalization raised the value of appellants' property arbitrarily and without notice or evidence.

A party in possession under a perfect Mexican grant, that is, a grant absolute and unconditional in form, specific in description of the land, passing a certain, definite and unconditional title from the Mexican govern-

ment to the grantee, has a possessory and equitable right sufficient to sustain taxation, although the grant may not have been confirmed.

A court cannot strike down a levy of taxes said to be for the payment of interest on bonds illegally issued in violation of statutory law, without a full disclosure of all the indebtedness, the time when it arose, and the circumstances under which it was created.

To warrant the setting aside of an assessment as unfair and partial, something more than an error of judgment must be shown, something indicating fraud or misconduct; as matters of that kind are left largely to the discretion and judgment of the assessing and equalizing board, and if it has acted in good faith its judgment cannot be overthrown.

This was a suit in the District Court of the First Judicial District of the Territory of Arizona, sitting in and for the county of Pima, to recover delinquent taxes. Several parties were included as defendants. A decree was rendered May 7, 1892, establishing the taxes and foreclosing the tax liens. The appellants, after a motion for a new trial, carried the case to the Supreme Court of the Territory, by which, on January 17, 1894, the decree was affirmed, 37 Pac. Rep. 370, and thereupon an appeal was taken to this court.

These judicial proceedings to collect delinquent taxes were authorized by statute. Rev. Stats. Arizona, 1887, §§ 2684, 2685, 2686, 2687 and 2688. The first of these sections provides that the tax collector on the third Monday of December in each year shall prepare and file in the office of the county treasurer a list of delinquent taxes. Section 2685 requires him on or before the first Monday in February thereafter to publish such delinquent tax list, with a notice that he will apply to the District Court of the county at the next ensuing term thereof for judgment. Section 2686 directs the district attorney, upon the completion of the publication, to file a complaint in the District Court setting forth the fact of the delinquent list, its publication and the notice, and praying for judgment and decree against the property described in said list for the taxes assessed thereon. It further provides:

"The delinquent list shall be *prima facie* evidence that the taxes therein are due against the property described in said list. Upon said publication and advertisement being made and the filing of said complaint, the said District Court shall

acquire full and complete jurisdiction over the lands, real estate and property described and contained in said delinquent list for all purposes whatever necessary to enable the said court to carry out the purposes and intention of this act."

Section 2687 contains certain general provisions in reference to the proceedings. Section 2688 is as follows:

" The court shall examine said list, and if defence (specifying in writing, the particular cause of objection) be offered by any person interested in any of said property, to the entry of judgment against the same, the court shall hear and determine the matter in a summary manner; without pleadings, and shall pronounce judgment as the right of the case may be. The court shall give judgment for such taxes and special assessments, interest, penalties and costs as shall appear to be due, and such judgment shall be considered as a several judgment against each parcel of property, or part of the same, for each kind of tax or special assessment included therein; and the court shall direct the clerk to make out and enter an order for the sale of such property against which judgment is given, which shall be substantially in the following form."

*Mr. Charles Weston Wright* for appellants.

*Mr. William H. Barnes* for appellee.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

The statute, as will be seen, authorizes any one interested in any of the property to defend against the taxes sought to be charged thereon, " specifying in writing the particular cause of objection," and requires the court, when such defence is made, to " hear and determine the matter in a summary manner, without pleadings," and to " pronounce judgment, as the right of the case may be." The statute also provides that the delinquent tax list is *prima facie* evidence that the " taxes therein are due against the property."

The appellants filed ten objections to the taxes charged

against their property, one of which was that "said delinquent list as published and filed herein is not a copy of the original." It appears from the bill of exceptions that on the hearing before the court the printed copy of the delinquent list, and not that filed in the office of the county treasurer, was offered and received in evidence. To the introduction of this printed copy appellants made several objections, but not that the original was the best evidence or should be first offered, or that the printed list was not an exact copy of the original. It would seem from the findings, and the rulings made by the trial court, as well as from the motion for a new trial, that the published delinquent list was treated as though it were the original; and that in the Supreme Court of the Territory was the question for the first time distinctly made that no judgment could be rendered except upon the evidence furnished by the original list. Be that as it may, and conceding without deciding that properly in an action like this the original list should be offered in evidence, nevertheless we are of opinion that the appellants cannot now take advantage of this. They did not in their objections point out wherein the delinquent list was incorrectly published, and they made no objection to the admission in evidence of such published list on the ground that the original had not first been offered or that the published list was different from the original. It might be that in the description of other property, or the taxes charged thereon, there were such mistakes as to defeat the proceedings as to such property, or in reference to their own property and the taxes charged thereon that there was some trifling inaccuracy so as to make it true that the published list was not a copy of the original, but it would not follow therefrom that they were entitled to a judgment. *De minimis non curat lex* might uphold the publication. As they were called upon in the challenge of these taxes to point out specifically their objections, and as they did not show wherein the published list differed from the original, we cannot assume that the variance, if any there were, was sufficient to affect their substantial rights. While in a general sense it may be true that in such a proceeding the Territory is the plaintiff and is called

upon to prove its case, yet the presumptions which by the statute attach to the regularity of the proceedings, and the duty cast upon the objectors to specifically point out the defects, forbid our disturbing the judgment upon such technical ground, one apparently an afterthought and not affecting the substantial rights of the appellants.

Again, it is insisted that the court had lost its power to enter judgment by reason of lapse of time. The facts upon which this contention is based are these: Section 2685, which provides for a publication of the delinquent list, requires that the collector append to and publish with the list, in addition to the notice of application for judgment, a notice that on the Monday next succeeding the day fixed by law for the commencement of the term of the District Court the property will be sold. Section 2690 directs the clerk of the District Court to give a duly certified copy of the judgment to the tax collector as the process under which the property is to be sold. Section 2693 requires the collector to attend on the day named in the notice, expose the property for sale, and continue the sale from day to day until all the property is sold, completing the sale within twenty days from the commencement thereof. Section 2687 makes special provisions for action by the court at an ensuing term, but is inapplicable to the questions here presented.

The court convened on the 14th of March. The notice published by the tax collector was that the sale would begin on the 20th of March. On March 15 a judgment was entered directing the sale on the 20th of all the property, to which no objection had been filed. As to those parties making objections (and included among them were the present appellants) the case was set down for hearing at a subsequent day, and a trial then had; but the judgment was not entered until the 7th day of May, 1892, and the order was to sell on the 13th day of June. Now the argument is that as this is a special statutory proceeding its exact terms must be complied with or the court loses its jurisdiction; the effect of which as applied to a case like the present would be that if the objectors present questions which the court cannot conscientiously de-

cide at the moment and takes time for consideration, it may thereby lose its jurisdiction to act at all. We do not so understand the law. The District Court is one of general jurisdiction. Section 2686 provides that upon the completion of the publication and the filing of the complaint the "court shall acquire full and complete jurisdiction" over the property for all purposes whatever necessary to enable it to carry out the purposes and intention of the act. The special provisions, to which we have heretofore referred, will doubtless guide in all cases in which no contest is made. They were evidently designed to secure prompt action on the part of the tax collector, as well as the court, and if no objections be made and a delinquent tax list, correct in form and duly published, is presented there need be no delay in entering the judgment. But inasmuch as this proceeding is one in a court of general jurisdiction it would require very precise and prohibitory language in the statute in order to withhold from that court the ordinary functions and powers of such a tribunal, among which is not only the right but the duty of giving such full consideration to all questions presented as its judgment determines is necessary. No such prohibitory language is found. The purposes and intention of the act are the collection of taxes, but only of such taxes as ought to be collected, and judicial determination is invoked to determine what taxes are justly due; and that the court takes time for the examination and consideration of this question does not oust it of jurisdiction.

Another objection is to the entry on this delinquent tax list of taxes for the year 1889. It appears that on the 21st of September, 1891, the board of supervisors adopted a resolution, reciting in substance that the property described therein (which included the property of appellants) was duly assessed for the taxes of the year 1889; that it became delinquent; that a suit to recover the taxes was duly brought, in which it was finally adjudged that the publication was insufficient, and that the taxes could not be recovered in such action; and that they had not been paid, and directing that the property be reassessed, and the taxes for the year 1889 be relevied upon it,

and that the clerk insert such taxes on the tax roll for the current year. This was done under authority of an act of the legislature (Sess. Laws, 1891, p. 146), which reads as follows:

"Sec. 1. Whenever any tax or assessment, or any part thereof, levied on real or personal property, whether heretofore or hereafter levied shall have been set aside or determined to be illegal or void, or the collection thereof prevented by the judgment of any court, or wherever any tax collector shall have been prevented by injunction from collecting or returning any such tax or assessment in consequence of any irregularity or error in any of the proceedings in the assessment of such real or personal property, the levy of such tax, or the proceedings for its collection, or of any erroneous or imperfect description of such property, or of any omission to comply with any form or step required by law, or the including of any illegal addition with the lawful tax, or for any other cause; then, if the real or personal property was properly taxable or assessable, if it be not a proper case to collect by a resale of the property, such tax, or so much thereof as shall not have been collected and as may be taxable or assessable thereto, may be reassessed or relieved upon such property at any time within four years after such judgment or the dissolution of the injunction, if any was granted as above stated; and the proper county board of supervisors shall make an order directing the same to be reassessed upon such property; and the clerk of the board of supervisors of said county shall insert the same in the tax roll, opposite such description of said property, in a separate column, as an additional tax, and the same shall be collected as a part of the tax for the year when so placed on the tax roll, in the same manner and with like penalties as other taxes are collected."

No other evidence was offered by the Territory than the delinquent tax list and the above resolution. It is contended that this evidence is insufficient; that the board of supervisors have no power to act except upon the existence of certain precedent conditions which must be affirmatively shown; and, further, that if this be not so, the recital in the resolution, of itself, shows that there was no sufficient warrant for charging

these taxes against the property. This contention cannot be sustained. The delinquent tax list is made *prima facie* evidence that the taxes charged therein are due against the property. This means all the taxes; not only those for the current year, but those for past years, and this tax list was, therefore, *prima facie* evidence, of the rightfulness of the charge against the property for the taxes of the prior year. If there were any valid reason why the property should not be subjected to those taxes it was the duty of the objectors to state the reason and give evidence in support thereof. While it may be, as counsel insist, that the section quoted is "unhappily worded" and "certainly crude," yet its meaning is obvious. The clauses "the collection thereof prevented by the judgment of any court" and "if the real or personal property was properly taxable or assessable, if it be not a proper case to collect by a resale of the property, such tax . . . may be reassessed or relieved upon such property at any time within four years after such judgment," mean that whenever a suit has been instituted in a court, as provided by the statute heretofore referred to, and fails to become operative through the judgment of the court, then, if the property is properly taxable and no resale can be had without further action of the court, the board of supervisors may place the property upon the tax roll of the current year to be collected as other taxes of that year.

From the recital in this resolution, it appears that certain proceedings for the collection of taxes for 1889 failed by reason of the judgment of the court, declaring the publication insufficient. That put an end to the suit. It was not a defect in the process issued after and upon the judgment, which, perhaps, might be obviated by the issue of new process, but a failure of the court to render judgment because of prior defects. Under those circumstances the power and the duty of the board of supervisors to renew efforts to collect such taxes were given and imposed by this section, and the procedure provided was a reassessment and the placing of the taxes on the tax roll for the current year. This was done and nothing more; and no evidence was offered to show that those

taxes were not properly chargeable upon the property, or that they had ever been paid. Evidently it was the intention of the legislature, and a just intention, that no property should escape its proper share of the burden of taxation by means of any defect in the tax proceedings, and that, if there should happen to be such defect, preventing for the time being the collection of the taxes, steps might be taken in a subsequent year to place them again upon the tax roll and collect them.

Again, it is contended that the board of equalization raised the value of the property of appellants arbitrarily and without notice or evidence. But the testimony does not sustain this contention. The only evidence in respect to the matter was that of a witness, T. A. Judd, who testified that the board of equalization added six per cent to the value of stock cattle; but nowhere does it appear that this was done without proof of the value, or without due notice to all parties interested. We cannot assume, in the face of the *prima facie* evidence furnished by the delinquent tax list, that any official failed in his duty.

Another objection is that part of the property held to be subject to taxation was an unconfirmed Mexican land grant. It was admitted on the hearing in the District Court that certain tracts of land in the list described were " each Mexican land grants, and that the same are not and have never been confirmed." Upon this it is strongly insisted that no title passes until confirmation; that it may yet be adjudged that these lands are the property of the United States, and that until that question is definitely decided the lands are not subject to taxation. The cases relied upon are *Colorado Company* v. *Commissioners*, 95 U. S. 259; *Botiller* v. *Dominguez*, 130 U. S. 238, and *Astiazaran* v. *Santa Rita Land & Mining Co.*, 148 U. S. 80. In the first of these cases a Mexican land grant, covering some five hundred thousand acres, was confirmed by Congress to the extent of eleven square leagues, with a proviso that there should be a survey of those leagues, and that the confirmation should not become legally effective until the claimant had paid the cost thereof; and it was held, following *Railway Company* v. *Prescott*, 16 Wall. 603, and

*Railway Company* v. *McShane*, 22 Wall. 444, that until the survey fees had been paid the United States retained such an interest in the land as to exempt it from taxation. In the second the decision was that no title to land in California depending upon Spanish or Mexican grants could be of any validity until submitted to and confirmed by the board provided for that purpose under the act of March 3, 1851, c. 41, 9 Stat. 631, but that decision was based upon § 13 of the act, which expressly provided that "all lands the claims to which shall not have been presented to the said commissioners within two years after the date of this act, shall be deemed, held and considered as part of the public domain of the United States." In the last of these cases it was held that under the acts of July 22, 1854, c. 103, 10 Stat. 308, and July 15, 1870, c. 292, 16 Stat. 291, 304, a private claim to land in Arizona under a Mexican grant, which had been reported to Congress by the surveyor general of the Territory, could not, before Congress had acted on that report, be contested in the courts of justice. In other words, the validity of such claim could only be determined in the particular tribunal which had been provided for such purpose.

It must be borne in mind that in the record before us these land grants are not otherwise described than as Mexican land grants. For aught that appears, they may have been "perfect grants," as they are sometimes called; that is, grants absolute and unconditional in form, specific in description of the land, passing a title from the Mexican government to the grantee as certain, definite and unconditional as a patent to a similar tract from the United States : and not "imperfect grants"; that is, grants of so many acres or leagues of land within large exterior boundaries, and based upon conditions precedent, and creating only an inchoate though equitable title to some as yet indefinite and undescribed tract. These perfect grants vest at least an equitable title in the owner. The general rule of international law is that a mere transfer of sovereignty over a territory has no effect upon vested rights of property therein; and whatever provision may be made in the treaty or by the law of the nation receiving the trans-

fer for purposes of identification, such provision is not to be considered as tantamount to either a denial or a suspension of these vested rights. Certainly a party in possession of a tract of land under a perfect grant has a possessory and equitable right which is of value, and that is enough to sustain taxation. The revenue act of the Territory (Rev. Stats. Arizona, § 2630) provides "that all property of every kind and nature whatsoever within this Territory shall be subject to taxation," and § 2631 defines the term "real estate," as used in the act, "to mean and include the ownership of, or claim to, or possession of or right of possession to any land within the Territory."

It has been held that possessory rights founded upon mere occupation and improvements upon government land, though invalid as against the government, may be made the subject of barter and sale, and may be treated under the laws of the State and Territory as having all the attributes of property. *Lamb* v. *Davenport,* 18 Wall. 307; *Bishop of Nesqually* v. *Gibbon,* 158 U. S. 155, 168.

In *Central Pacific Railroad* v. *Nevada,* 162 U. S. 512, it was decided that the possessory claim of the railroad company to lands within the State of Nevada was subject to taxation, notwithstanding the fact that the lands might thereafter be determined to be mineral lands, and so excluded from the operation of the railroad grant. See also *Northern Pacific Railroad Company* v. *Patterson,* 154 U. S. 130, 132. Within the reasoning of these decisions, as it does not appear that these lands were not held by perfect grants under the laws of Mexico, or that they were not in the possession of the appellants, and covered with valuable improvements, it must be held that the objection to their taxation cannot be sustained.

Another objection is that a levy of fifty cents on the hundred dollars included in these taxes was made solely for the purpose of raising money to pay interest on bonds, and it is insisted that the bonds for which the levy was made were void under the act of July 30, 1886, c. 818, 24 Stat. 170, which prohibits a county from becoming indebted to an amount exceeding four per cent of the value of the taxable property

within the county. The bonds, which were in excess of the
four per cent, were issued on June 30, 1887, and subsequently
to the passage of the act. But, as is shown in the testimony,
they were funding bonds. For aught that appears, the real
indebtedness of the county had been created long before the
passage of the act, and these funding bonds may have been,
and probably were, nothing but simply a change in the form
of the indebtedness. Even if it were regarded as a new in-
debtedness, it would not follow that the whole series was
invalid, for the circumstances of the transaction might, if
fully disclosed, show that even as new indebtedness they were
valid for a certain amount, that is, an amount equal to four
per cent of the value of the county's taxable property. It
cannot be that, in this indirect way, and without a full dis-
closure of all the facts concerning the indebtedness, the time
when it arose and the circumstances under which it was
created, a court can strike down a levy for the payment of
interest on the bonds.

A final objection is that the assessment was grossly unfair,
and that there was a fraudulent discrimination in favor of the
Southern Pacific Railroad Company. It appears that the
assessment of ordinary range cattle was fixed by the territo-
rial board at $7.42, while one witness testified that their value
was from $6 to $6.50 per head. It also appears that the ter-
ritorial board valued the railroad property at $6811.14 per
mile, while there was testimony that to duplicate the roadbed
and track alone would cost from $21,000 to $22,000 per mile;
and appellants offered to prove that the railroad company
stated to the board that if the valuation was fixed at about
the rate which was fixed it would pay the taxes; if much
higher, it would resist collection in the courts; and that the
board concluded that it was better to get some taxes out of
the railroad company than none, and therefore fixed the valua-
tion at the sum named.

There is nothing tending to show that the board, in fixing
the value of cattle at $7.42, acted fraudulently or with any
wrongful intent, or that that valuation was not the result of
its deliberate judgment upon sufficient consideration and

abundant evidence, and it would be strange, indeed, if an assessment could be set aside because a single witness is found whose ·testimony is that the valuation was excessive. No assessment could be sustained if it depended upon the fact that all parties thought the valuation placed by the assessing board was correct. Something more than an error of judgment must be shown, something indicating fraud or misconduct. Neither is the fact that an officer of the railroad company came before the board and declared its willingness to pay taxes on a certain valuation and its intention to resist the payment of taxes on any higher valuation sufficient to impute fraudulent conduct to the board, although it finally fixed the valuation at the sum named by the railroad company. It appears from the testimony of one of the members of the equalization board that it was guided largely by the valuation placed in other States and Territories upon railroad property, and that from such valuation, as well as from that given by the railroad company, it made the assessment at something like the average of the valuation of railroads in the various States and Territories named. It is unnecessary to determine whether this board erred in its judgment as to the value of this property, whether it would not have been better to have made further examination and taken testimony as to the cost of construction, present condition, etc. Matters of that kind are left largely to the discretion and judgment of the assessing and equalizing board, and if it has acted in good faith its judgment cannot be overthrown. *Pittsburgh, Cincinnati &c. Railway* v. *Backus*, 154 U. S. 421–435.

These are all the matters presented by counsel. We find in them nothing which justifies us in disturbing the judgment of the court below, and it is

*Affirmed.*