[No. 25027. *En Banc.* April 19, 1934.]

HARRY D. DEARLING, *Appellant,* v. LEONARD FUNK *et al., Respondents.*[1]

[1]Reported in 32 P. (2d) 548.

*Burcham & Blair,* for appellant.

*George M. Ferris* and *Louis A. Conyard,* for respondents.

MILLARD, J.—In behalf of himself and all other taxpayers of the city of Spokane, plaintiff instituted this

action to enjoin the issuance, by the defendants as city commissioners and officers of the city of Spokane, of general obligation bonds in the sum of $150,000. The trial of the cause resulted in judgment dismissing the action and adjudicating the validity of the bonds. Plaintiff has appealed.

The proposed bonds were not authorized by the electorate. The authority for them rests only in ordinance No. C5272, passed by the city council January 22, 1934. The proceeds from the sale of the bonds were to be used (1) to pay the cost of tools, equipment, trucking and pipe-hauling in connection with the construction of certain sewers by the Civil Works Administration of the United States government, (2) to fund into bonds certain outstanding emergency warrants, and (3) to fund warrants issued to defray the cost of securing right of way for highways. The pertinent portion of the ordinance reads as follows:

"An ordinance providing for the issuance and sale of general bonds of the city of Spokane in the aggregate sum of $150,000 the proceeds thereof to be used for the payment of the cost of the necessary tools, equipment, trucking and pipe hauling for the construction of the Union Park and Hillyard Trunk Sewers in the sum of $34,000, and for funding emergency appropriations, and warrants issued therefor, in the sum of $41,000, and for funding certain negotiable warrants issued for the purpose of defraying the cost of securing the right of way necessary for west approach highways to the city of Spokane in the sum of $75,000; providing for the payment of the interest and principal of such bonds; and declaring an emergency.

"Whereas, it is necessary, in order to protect the health of the citizens of the city of Spokane, to construct the Union Park and Hillyard Trunk Sewers, plans for said sewers being on file in the office of the city engineer of said city and having been heretofore duly approved by the city council; and,

"Whereas, there are 5,000 families, or in excess of 20,000 people, in the city of Spokane who are now, and for many months have been, destitute and indigent because of their inability to secure employment; and,

"Whereas, there are approximately 10,000 men who are out of employment and who will likewise soon require aid unless they are furnished with employment; and,

"Whereas, the Federal Government, under the Civil Works Administration, has approved said sewer projects above referred to and has agreed to provide the funds necessary to pay the wages of the men who are put to work by the city of Spokane on said projects, and has also agreed to pay for the material necessary in the construction of said projects; and,

"Whereas, it is necessary for the city of Spokane to provide funds with which to pay for the tools, equipment, trucking and pipe hauling which are needed in connection with the construction of said sewer projects, totaling the sum of $34,000; and,

"Whereas, under the National Industrial Recovery Act approved June 16, 1933, the Federal Emergency Administration of Public Works has made available to the Highway Department of the State of Washington funds for the construction of highways within said state, said highway construction to be under the supervision of the Director of Highways of the state; and,

"Whereas, with funds made available under said National Industrial Recovery Act, the Highway Department of the State of Washington is constructing and improving certain state highways known as the Inland Empire and Sunset Highways, the route of which enters the city of Spokane on the south and west and passes over and across certain streets of the city; and,

"Whereas, under said National Industrial Recovery Act, all right of way necessary in the construction of such highways within the limits of any city must be purchased by said city in order that the city may take advantage of the provisions of such act; and,

"Whereas, at the time of making the budget for the year 1934, it was estimated that the sum of $34,000 was sufficient for the purchase of the right of way

within the city of Spokane necessary in the construction and improvement of said Inland Empire and Sunset Highways, and said sum was appropriated in said budget for such purpose; and,

"Whereas, since the making of said budget, the said State Highway Department changed its plans and the route of said highways within the city of Spokane, making it necessary for the city of Spokane to purchase additional right of way in the sum of $41,000; and,

"Whereas, under Ordinance No. C5271, the city council of the city of Spokane appropriated said additional sum of $41,000 for said right of way within the city; and,

"Whereas, pursuant to the terms of Ordinance No. C5253, passed by the city council October 9, 1933, the city of Spokane issued its general obligation warrants upon the '1933 Construction Fund' in the aggregate sum of $75,000, for the purpose of paying the cost of said right of way within the city of Spokane necessary in the construction and improvement of said Inland Empire and Sunset Highways by said State Highway Department under the terms of the National Industrial Recovery Act approved June 16, 1933; and,

"Whereas, said ordinance No. C5253 provided that said warrants should be retired from funds made available from a bond issue to be submitted to the voters of said city for their approval and adoption, or rejection, under Ordinance No. C5244, passed by the city council of said city on October 2, 1933, which bond election was held on November 21, 1933, and said proposition rejected by the voters, making it necessary to fund said warrants by the bond issue herein provided for; and,

"Whereas, said general obligation warrants, issued pursuant to said Ordinance No. C5253, draw interest at the rate of six per cent per annum, and it will be advantageous to the city to have them funded into bonds running for a longer period of time and drawing a less rate of interest; and,

"Whereas, during the calendar years of 1932 and 1933, the city of Spokane passed ordinances making

emergency appropriations for the purpose of carrying on its governmental functions; and,

"Whereas, the emergency warrants authorized by the ordinances making said several emergency appropriations aggregate in the sum of $41,000 and have been temporarily funded by advances from other funds of the city appropriated for specific uses; and,

"Whereas, the city council of the city of Spokane has, in its budget ordinance for the year 1934 provided for the permanent funding of such emergency appropriations and warrants by the issue of general obligation bonds of the city of Spokane; and,

"Whereas, a grave public emergency exists which, unless provided for, may seriously endanger the public health and the preservation of order within said city of Spokane; and,

"Whereas, in the opinion of the city council of said city, it is a necessary governmental function imposed by the constitution and laws of this state to provide relief for persons situate as hereinbefore described in this ordinance; and,

"Whereas, a governmental emergency exists requiring the issuance and sale of the $150,000 of general bonds of the city of Spokane as hereinbefore stated; and,

"Whereas, the issuance and sale of said $150,000 of general bonds of said city will not take the city's indebtedness beyond the one and one-half per centum limit, as provided in the constitution of the State of Washington,—Now, Therefore,

"The city of Spokane does ordain:

"Section 1. That, for the reasons set forth in the preamble hereof, a governmental emergency exists requiring the issuance and sale of the bonds as herein set forth.

"Section 2. That there be issued general obligation bonds of the city of Spokane in the sum of $150,000, consisting of 150 bonds of $1,000 each, numbered from 1 to 150, both numbers inclusive, and dated as of March 1, 1934. Said bonds shall bear interest at a rate not to exceed six per cent per annum, payable semi-annually on the first days of September and March in each year

upon presentation and surrender of interest coupons to be annexed to said bonds. Both the principal and interest of said bonds are to be paid in lawful money of the United States of America at the fiscal agency of the State of Washington in the city of New York. Said bonds shall be serial in form and, in conformity with the provisions of Chapter 151 of the 1923 Session Laws of Washington, shall mature annually as follows (the city council finding that as nearly as practicable such annual maturities will, together with interest upon all outstanding bonds, be met by an equal annual tax levy; and the city council further finding that the life of the improvements to be constructed with a portion of the proceeds of said bonds will, as nearly as practicable, be equivalent to the period for which said bonds are to run):

| "Date of Maturity | Bond Nos. | Amount |
|---|---|---|
| "March 1, 1936 | 1 to 5 | $5,000.00 |
| "March 1, 1937 | 6 to 10 | 5,000.00 |
| "March 1, 1938 | 11 to 15 | 5,000.00 |
| "March 1, 1939 | 16 to 20 | 5,000.00 |
| "March 1, 1940 | 21 to 26 | 6,000.00 |
| "March 1, 1941 | 27 to 32 | 6,000.00 |
| "March 1, 1942 | 33 to 39 | 7,000.00 |
| "March 1, 1943 | 40 to 46 | 7,000.00 |
| "March 1, 1944 | 47 to 53 | 7,000.00 |
| "March 1, 1945 | 54 to 61 | 8,000.00 |
| "March 1, 1946 | 62 to 69 | 8,000.00 |
| "March 1, 1947 | 70 to 78 | 9,000.00 |
| "March 1, 1948 | 79 to 87 | 9,000.00 |
| "March 1, 1949 | 88 to 96 | 9,000.00 |
| "March 1, 1950 | 97 to 106 | 10,000.00 |
| "March 1, 1951 | 107 to 116 | 10,000.00 |
| "March 1, 1952 | 117 to 127 | 11,000.00 |
| "March 1, 1953 | 128 to 138 | 11,000.00 |
| "March 1, 1954 | 139 to 150 | 12,000.00 |

"Total ............................$150,000.00

"Section 3. Said bonds shall be known as 'City of Spokane General Bonds of 1934,' shall be signed by the mayor, sealed with the corporate seal of the city, attested by the city clerk, and countersigned by the

city treasurer, and the coupons annexed thereto shall be signed with the lithographed signatures of said mayor, city clerk and treasurer; and said bonds shall be substantially in the following form:

"UNITED STATES OF AMERICA

"STATE OF WASHINGTON

"CITY OF SPOKANE GENERAL BOND OF 1934

"No.                                                          $1,000.00

"KNOW ALL MEN BY THESE PRESENTS, That the city of Spokane, in the state of Washington, for value received, hereby promises to pay to the bearer, on the 1st day of March, 19........, the principal sum of $1,000, with interest thereon from the date hereof at the rate of................per cent per annum, payable semi-annually on the first days of March and September, in each year, upon the presentation and surrender of the annexed interest coupons, as they respectively mature. Both principal and interest of this bond are payable in lawful money of the United States of America, at the fiscal agency of the state of Washington in the city of New York.

"This bond is one of a series of bonds of like date, tenor and amount, except as to maturities, aggregating $150,000, issued for the purpose of paying the cost of the necessary tools, equipment, trucking and pipe hauling for the construction of the Union Park and Hillyard Trunk Sewers; for funding certain emergency appropriations and warrants issued therefor; and for funding certain negotiable warrants of the city of Spokane issued for the purpose of defraying the cost of securing the right of way necessary for west approach highways in the city of Spokane; and is issued under the authority of, and in strict compliance with, the charter of the said city and the laws and constitution of the state of Washington, and pursuant to the provisions of Ordinance No. C................, passed the city council of said city on the ................day of January, 1934. It is further declared that the total indebtedness of the city of Spokane including this issue of bonds is not in excess of any constitutional or statutory limit of indebtedness.

"The full faith, property and credit of the city of

Spokane are hereby irrevocably pledged for the full payment of said bonds and interest coupons according to the tenor thereof.

"In Testimony Whereof, the said city of Spokane has caused this bond to be signed by its mayor, sealed with its corporate seal, attested by its city clerk, and countersigned by its city treasurer; and the coupons annexed to be signed with the lithographed signatures of said mayor, city clerk and treasurer, this 1st day of March, 1934.

"_____, Mayor.

"Attest: _____, City Clerk.

"Countersigned: _____, City Treasurer.

"Coupon No. _____

"On _____, 19_____, the city of Spokane, Washington, will pay to bearer, at the fiscal agency of the state of Washington in New York City, the sum of _____ dollars ($_____), in lawful money of the United States of America, being six months' interest that day due on its 'City of Spokane General Bond of 1934,' numbered _____.

"_____, Mayor.

"Attest: _____, City Clerk.

"Countersigned: _____, City Treasurer.

"Section 4. There shall be levied each year on all the taxable property in the city of Spokane taxes sufficient to pay said bonds and the interest thereon as the same shall accrue. Said taxes shall be levied and collected each year as other taxes for municipal purposes are levied and collected, and the full faith and credit of the city of Spokane are hereby irrevocably pledged for the annual levy and collection of said taxes and the regular payment of such principal and interest, in accordance with the terms of the bonds and coupons.

"Section 5. Said bonds when executed by the officials of the city shall be delivered to the Sinking Fund Commission, who shall negotiate the sale thereof in accordance with the provisions of law.

"Section 6. The proceeds of said bonds shall be used for the purposes recited in the preamble hereof.

"Section 7. For the reasons set forth in the preamble of this ordinance, an urgency and emergency for

the passage of this ordinance is hereby declared to, and does, exist, and the same shall take effect immediately upon its passage.

"Passed the city council January 22, 1934."

■ Appellant first contends that the bonding ordinance is duplicitous, therefore invalid, in that it contains more than one subject, in violation of § 13 of Art. III of the Spokane city charter, which provides that

"The subject of every ordinance shall be set out clearly in the title thereof, and no ordinance except one making appropriations shall contain more than one subject. Ordinances making appropriations shall be confined to the subject of appropriations."

The only purpose of the ordinance is to provide for a bonded indebtedness solely for proper municipal purposes. The ordinance does not embrace more than one subject. It contains no subject unrelated to all other matters embraced within the ordinance. The trial court correctly found:

"Said ordinance . . . provides, as shown by said ordinance, for the issuance of bonds by said city . . . and deals with and relates to the ordering, authorizing and issuance and sale alone of said bonds, although said bonds are issued for the three purposes mentioned in the title and body of said ordinance . . . all of which purposes are municipal purposes and for the advantage of said municipality; . . . and further finds that the subject of said ordinance was limited to the matter of the issuance of said bonds, which said subject was set out clearly in the title thereof and which said ordinance contained but one subject, . . ."

An apt authority is *Seattle v. Sylvester-Cowen Inv. Co.*, 55 Wash. 659, 104 Pac. 1121. In that case, the Seattle charter provision that "every ordinance . . . shall contain but one subject, which shall be clearly expressed in its title" was invoked in testing

the validity of an ordinance similar in principle to the ordinance in the case at bar. The ordinance in the case cited provided for the laying out, extending, etc., of certain streets as highways, boulevards and parkways, and for the condemnation of land therefor. Holding the ordinance valid, we said:

"It is asserted that the ordinance discloses two distinct objects, (1) condemnation of certain property for public streets, highways, and parkways; and (2) condemnation of certain other property for a park; and that these objects are diverse and incongruous and have no relation to or connection with each other. If the postulate be accepted, the conclusion would follow. We think that both the title and the body of the ordinance make it clear that there is but a single general subject, viz., the condemnation of land for a public use. The charter provision does not forbid the lawmaking body from passing an ordinance having a general object, and it may bring within its scope any number of sub-subjects germane to the general subject. Whatever is legitimately connected with a unified subject may be embraced in a single title or act. We have said by way of argument and of illustration that the entire subject of pleadings could be treated under a title in relation to pleadings, and also that an entire code of civil procedure would be germane to the title 'An act to provide for a code of civil procedure.' Stated in another form, the lawmaking body may make the object as comprehensive as it sees fit, provided it relates to one general relevant and connected subject. The provision invoked was adopted as a shield to prevent the union of diverse, incongruous, and disconnected matters, but it cannot be used as a sword to strike down useful legislation not within the mischief sought to be avoided."

Holding, in *McQueen v. Kittitas County,* 115 Wash. 672, 198 Pac. 394, that the constitutional provision (Art. II, § 19) that no act shall embrace more than one subject, which shall be expressed in the title, does not

prohibit the enactment of a complete law on a given subject, even though the provisions of the law may be numerous and varied, we said:

"But this provision of the constitution was intended to prevent the legislature from embracing in one act wholly unrelated subjects; it was not intended to prevent the enactment of a complete law on a given subject, even though the provisions of the law may be numerous and varied. The question then always is, does the act contain unrelated matters. Tested by the rule, we are unable to see that this act contains any provision not proper to be included in its subject as expressed by its title."

See, also, *State ex rel. Conner v. Superior Court*, 81 Wash. 480, 143 Pac. 112.

█ Appellant next insists that this bond issue of $150,000 will carry the city beyond the one and one-half per cent indebtedness limitation fixed by Art. VIII, § 6, of the constitution, reading as follows:

"No county, city, town, school district, or other municipal corporation shall for any purpose become indebted in any manner to an amount exceeding one and one-half per centum of the taxable property in such county, city, town, school district, or other municipal corporation, without the assent of three-fifths of the voters therein voting at an election to be held for that purpose, nor in cases requiring such assent shall the total indebtedness at any time exceed five per centum on the value of the taxable property therein, to be ascertained by the last assessment for state and county purposes previous to the incurring of such indebtedness, except that in incorporated cities the assessment shall be taken from the last assessment for city purposes; *Provided,* That no part of the indebtedness allowed in this section shall be incurred for any purpose other than strictly county, city, town, school district, or other municipal purposes; *Provided, further,* That any city or town, with such assent, may be allowed to become indebted to a larger amount, but not

exceeding five per centum additional for supplying such city or town with water, artificial light, and sewers, when the works for supplying such water, light, and sewers shall be owned and controlled by the municipality.''

The assessed valuation of taxable property in the city of Spokane is $68,817,248; one and one-half per cent of which is $1,032,258, the legal municipal indebtedness which may be incurred by authority of the city council without the sanction of the electorate. There are outstanding general obligation bonds, not authorized by vote of the electorate, amounting to $1,159,000. Adding thereto gross warrant and other indebtedness existing against the city without election authorization, the total indebtedness of the city within the one and one-half per cent classification is $1,379,558. The proposed bond issue would increase the indebtedness within the one and one-half per cent class to $1,529,558. Clearly, then, the city's indebtedness is far beyond the one and one-half per cent limit, and the proposed bond issue is invalid, unless the city has existing assets which may be offset against the indebtedness in an amount to bring the total indebtedness, including the proposed bond issue, within the sum of $1,032,258.

In its computation of the city's indebtedness, the trial court found that the following items are deductible from the present indebtedness in the one and one-half per cent class:

"ITEMS DEDUCTIBLE FROM FOREGOING GROSS 1½% CLASSIFICATION INDEBTEDNESS OF $1,032,258.00:

"(a) Moneys and marketable securities in general sinking fund............ $63,617.00

"(b) Moneys and marketable securities in water sinking fund available for payment of foregoing 1910 bonds...... 261,746.00

"(c)  Moneys and marketable securities in asphalt plant sinking fund......  $16,549.00

"(d)  Uncollected general taxes net for four years, 1930, 1931, 1932 and 1933 (not taxes for 'current' expenses).  540,529.00

"(e)  Uncollected general taxes for years prior to 1930 (not for 'current' expenses) ..........................  49,376.00

"(f)  Cash on hand in operating funds (not for carrying on municipal business for current year 1934)........  161,943.00

"(g)  General taxes levied in the year 1933, payable in the year 1934, being other than, and in addition to the foregoing 1933 general taxes, for municipal purposes other than for the purpose of carrying on the business of the city for the current year of 1934..............  247,742.00

"(h)  Any cash on hand, other than cash on hand for the purpose of carrying on the business of the city during the current year 1934, which may be available for the payment of any portion of said indebtedness ...................  330,756.00

"Total Deductible Items............$1,672,258.00"

We said, in *Tabb v. Funk,* 170 Wash. 545, 17 P. (2d) 18, respecting the rule as to deductible items adopted in *State ex rel. Barton v. Hopkins,* 14 Wash. 59, 44 Pac. 134:

"The rule there stated is that uncollected current and delinquent taxes may be considered as cash assets in computing the indebtedness of a municipality and the amount thereof, together with cash on hand, may be deducted from the outstanding present indebtedness.  The amount remaining after such deduction is the amount of the municipal indebtedness in contemplation of the constitutional limitation.

"But the rule of the *Barton* case has been modified by chapter 123, Laws of 1921, p. 400 (Rem. Comp. Stat., § 5606), which provides:

" 'Whenever it shall be necessary to compute the indebtedness of a taxing district for bonding or any other indebtedness purposes, taxes levied for the current year and cash on hand received for the purpose of carrying on the business of such taxing district for such current year shall be considered as an asset only as against indebtedness incurred during such current year which is payable from such taxes or cash on hand; *Provided, however,* That all taxes levied for the payment of bonds, warrants or other public debts of such taxing district shall be deemed a competent and sufficient asset of the taxing district to be considered in calculating the constitutional debt limit or the debt limit prescribed by this act for any taxing district: *Provided,* That the provisions of this section shall not apply in computing the debt limit of a taxing district in connection with bonds authorized pursuant to a vote of the electors at an election called prior to March 1, 1917.'

"As we construe this statute, 'current year' refers to the year in which the necessity for the computation arises. In this instance, it is the year 1932. The taxes for the 'current year,' however, were levied in 1931. So taxes levied in 1931 'for the purpose of carrying on the business of the city, during the current year,' cannot be deducted in making the computation. Nor can any cash on hand for that purpose be deducted. But under the first proviso, the amount of taxes levied 'for the payment of bonds, warrants and other public debts' may be deducted as an asset."

All of the items found by the trial court to be deductible are exclusive of taxes levied for carrying on the municipal business for the current year of 1934, and include moneys and marketable securities and "cash on hand," none of which is to be used during the current year of 1934. Clearly, all of the items are deductible under authority of *Tabb v. Funk, supra.*

The validity of refunding bonds was challenged in *Tabb v. Funk, supra,* on the ground that same carried the city beyond the debt limit of one and one-half

per cent, and had not been sanctioned by the electorate. In 1907, by a vote of the people, the city of Spokane was authorized to issue general obligation bonds for the purpose of repairing and building bridges. The bonds matured January 1, 1933. On October 17, 1933, the city council passed an ordinance providing for the refunding of the bonds. In sustaining the validity of the bonds in *Tabb v. Funk, supra,* we said the bonds, not being authorized by the electorate, came within the one and one-half per cent classification, notwithstanding they were designed to refund bonds authorized by the electorate.

In view of that language, counsel for appellant insists that, in the case at bar, the trial court erred in placing the refunding bond issue challenged in *Tabb v. Funk, supra,* within the three and one-half per cent classification. The finding reads as follows:

"In 1907, upon a vote of the electorate of the city of Spokane, said city and the city council thereof, were authorized to issue general obligation bonds for the purpose of repairing and building bridges in the aggregate principal amount of $400,000, which bonds matured according to their terms on January 1, 1933. These bonds, being thus voted, and being for general or strictly municipal purposes, were a municipal indebtedness within the $3\frac{1}{2}\%$ classification. The commissioners and city council of Spokane, being the defendants herein, on October 17, 1932, enacted Ordinance C5165, which provided for the refunding of the foregoing bonds of $400,000. This refunding was accomplished by the actual payment and retirement of the old bonds of $400,000 and by the issuance, immediately thereafter, as such old bonds were retired and cancelled, of the new refunding bonds, which were so issued, so that said old bonds of $400,000 which had been authorized by a vote of the electorate in 1907 were in fact paid and retired immediately before the issuance of the refunding bonds authorized by said Ordinance C5165, which two bond issues are those re-

ferred to in the case of *Tabb v. Funk,* 170 Wash. 545. (Therefore, inasmuch as the refunding bond *indebtedness* is a mere continuation of the preceding indebtedness, which was authorized by a vote of the electorate in 1907, we have placed this refunding bond issue of $400,000, authorized by Ordinance C5165, within the same, viz., the 3½% classification, which includes all indebtedness authorized by popular vote.)''

By § 6, Art. VIII, cities and other municipal corporations are inhibited from *increasing* their indebtedness in excess of one and one-half per cent of their taxable property without the sanction of the electorate. The inhibition is not against the number of bonds issued. In exchanging defaulted bonds authorized by the electorate for bonds in the same amount authorized by the council and without the sanction of the electorate, the city did not incur any indebtedness. There was not a new indebtedness. There was simply a change of form of indebtedness. The refunding bond issue constituted no more and no less than a promise to pay the same indebtedness. Not being the incurring of a new indebtedness, such refunding may be accomplished by action of the city council solely; the sanction of the electorate was unnecessary. Having been authorized by the electorate in 1907, the indebtedness did not lose its three and one-half per cent classification by the change in the form of the indebtedness.

The trial court correctly placed the four hundred thousand dollar refunding bond issue within the three and one-half per cent classification. Anything to the contrary in *Tabb v. Funk,* 170 Wash. 545, 17 P. (2d) 18, is hereby overruled.

Lastly, appellant contends

''. . . that the proposed 'prospective' indebtedness of $34,000 authorized by the city council alone without an election of the people, for the purpose of

paying the cost of the necessary 'tools, equipment, trucking and pipe-hauling' to be contributed by the city in aid of the Civil Works Administration of the Union Park and Hillyard Trunk Sewers, is an indebtedness prohibited''

by § 6, Art. VIII of the state constitution. Appellant further insists that it contravenes Rem. Rev. Stat., §§ 9488 and 9489, requiring an election to be had for the adoption of sewer-system plans preliminary to the proposed authorization of any such indebtedness for sewer purposes where such sewers are to become the property of, and will be owned and controlled by, the municipality.

An indebtedness incurred for purposes of water, artificial light and sewers would be the incurring of indebtedness for municipal purposes. The right to become indebted for such purposes within either the one and one-half per cent or the three and one-half per cent classification has not been denied to municipal corporations by § 6, Art. VIII of our constitution. If within the one and one-half per cent limit, such indebtedness may be incurred by councilmanic action solely; if within the three and one-half per cent limitation, the sanction of the electorate is required. The final paragraph of § 6, Art. VIII of the constitution, reading as follows, provides that, with the assent of the electorate, the city may become indebted in an amount not exceeding an additional five per cent for water, artificial light and sewers "when the works" of the water, light or sewer plant shall be owned and controlled by the city:

"Provided, further, that any city or town, with such assent, may be allowed to become indebted to a larger amount, but not exceeding five per centum additional for supplying such city or town with water, artificial light, and sewers, when the works for supplying such

water, light, and sewers shall be owned and controlled by the municipality.''

Such meaning was placed upon this constitutional provision by the legislature in clearly expressed language.

''Any city or town having a corporate existence in this state at the time of the adoption of the constitution thereof is hereby authorized and empowered to borrow money and to contract indebtedness in any other manner for general municipal purposes, not exceeding in amount, together with the existing general indebtedness of such city or town, one and one-half per centum of the taxable property in such city or town, to be ascertained by the last assessment for state and county purposes, previous to the incurring of such indebtedness, except that in incorporated cities the assessment shall be taken from the last assessment for city purposes, whenever it is deemed advisable to do so by the city or town council thereof.'' Rem. Rev. Stat., § 9532.

''Any such city or town may borrow money or contract indebtedness for strictly municipal purposes over the amount specified in the preceding section, but not exceeding in amount, together with the existing general indebtedness, five per centum of the taxable property in such city or town, to be ascertained as provided in the preceding section, through the council of such city or town, whenever three-fifths of the voters therein assent thereto, at an election to be held for that purpose, at such time, upon such reasonable notice, and in the manner presented by the city or town council, not inconsistent with the general election laws.'' Rem. Rev. Stat., § 9533.

''Any city or town described in section 9532 shall, in addition to the power granted in the preceding sections, have the power, through its council, to borrow money or to contract indebtedness in an amount not exceeding five per centum of the taxable property in such city or town, ascertained as provided in section 9532, for the purpose of supplying such city or town with water, artificial light, or sewers, when the plant

or plants used for such purposes shall be owned and controlled by the city, whenever three fifths of voters therein assent thereto at an election to be held for that purpose, according to the provisions of the last preceding section." Rem. Rev. Stat., § 9534.

By Rem. Rev. Stat., § 9488, any incorporated city within the state is authorized to acquire and operate plants for supplying such city with water, artificial light or sewers. Other pertinent sections of the public utilities statute read as follows:

"Whenever a city council or other corporate authorities of any such city or town shall deem it advisable that the city or town of which they are officers shall purchase, acquire or construct any public utility mentioned in section 9488 hereof or make any additions and betterments thereto or extensions thereof, the common council or other corporate authorities shall provide therefor by ordinance, which shall specify and adopt the system or plan proposed, and declare the estimated cost thereof, as near as may be, and the same shall be submitted for ratification or rejection to the qualified voters of said city at the general or special election, except in the following cases where no submission shall be necessary:

"(1) When the work proposed is an addition to, or betterment of, or extension of, or an increased water supply for, existing water works, or an addition, betterment or extension of an existing system or plant of any other public utility mentioned in section 9488 hereof, for which no general indebtedness is to be incurred by such city or town: *Provided,* Such undertaking shall have been authorized by the common council of such city or town prior to July first, nineteen hundred and ten; or

"(2) Where in any charter of any city or town in the State of Washington heretofore or hereafter adopted by a vote of the people, an article or provision has been adopted authorizing the city council or other corporate authorities of such city to provide by ordinance for acquiring, opening or operating any of said

public utilities, for which no general indebtedness is to be incurred by such city or town; or

"(3) When in the judgment of the city council, or other corporate authority of any such city or town, the public health is being endangered by the discharge of raw or untreated sewage into any river or stream in this state, and the danger to the public health may be abated by the construction and maintenance of a sewage disposal plant or plants, for which no general indebtedness shall be incurred by such city or town responsible for such contamination. If a general indebtedness is to be incurred, the amount of such indebtedness and the terms thereof shall be included in the proposition submitted to the qualified voters as aforesaid and such proposition shall be adopted and assented to by three-fifths of the qualified voters of the said city or town voting at said election. If no general indebtedness is to be incurred such proposition may be adopted by a majority vote. Ten days' notice of such election shall be given in the newspaper doing the city or town printing, by publication in each issue of said paper during said time. Whenever a proposition has been adopted as aforesaid or in the cases mentioned in subdivisions first, second and third of this section where no submission shall be necessary the common council or other corporate authorities of such city or town shall have power to proceed forthwith to purchase, construct and acquire the public utility contemplated or to make additions, betterments and extensions thereto and to make payment therefor as hereinafter provided in section 9490 and section 9491." Rem. Rev. Stat., § 9489.

"Whenever the qualified voters of any such city or town shall have heretofore adopted or shall hereafter adopt a proposition for any public utility as aforesaid, and shall have authorized a general indebtedness, general city or town bonds may be issued as hereinafter provided. Said bonds shall be registered or coupon bonds, shall be issued in denominations of not less than one hundred, or more than one thousand dollars; shall be numbered from one up consecutively; shall bear the date of their issue; shall be payable not

more than twenty years from date; and shall bear interest not exceeding six per cent per annum, payable semi-annually, with interest coupons attached, and the principal and interest shall be made payable at such place as may be designated. The bonds and each coupon shall be signed by the mayor and attested by the clerk under the seal of the city or town. There shall be levied each year a tax upon the taxable property of such city or town, as the case may be, sufficient to pay the interest on said bonds as the same accrue, and before seven years prior to the maturity thereof, an annual sinking fund sufficient for the payment of said bonds at maturity, which taxes shall become due and collectible as other taxes. Said bonds shall be printed and engraved, or lithographed, on good bond paper, and a duly authenticated copy of this act, together with the ordinance of the city or town directing the submission of such plan or system to the qualified voters of such city or town for ratification or rejection shall be printed on each bond, together with a printed copy of a signed statement by the mayor and clerk showing the result of said election. Such bonds shall be sold in such manner as the corporate authorities shall deem for the best interests of the city or town. A register shall be kept of all the bonds, which register shall show the number, date, amount, interest, to whom delivered—if coupon bonds—and the name of the payee—if registered bonds; and when and where payable, and each and every bond executed, issued or sold under the provisions of this subdivision.

"The total indebtedness incurred under the authority of this act, added to all other indebtedness of such city or town at any time outstanding, shall not exceed five per centum of the value of the taxable property therein, to be ascertained in the case of towns by the last assessment for state and county purposes, and in the case of cities by the last assessment for city purposes, previous to the incurring of such indebtedness: *Provided, however,* That any such city or town may become indebted to a larger amount, but not exceeding five per centum additional, for supplying such city or town with water, artificial light and sewers when

works for supplying such water, light, and sewers shall be owned and controlled by the municipality.'' Rem. Rev. Stat., § 9490.

We are convinced by our examination of the public utilities statute that the legislature did not intend to prevent the incurring of indebtedness within the one and one-half per cent limitation, by councilmanic action alone, without an election, for any public utility, whether it be for a ''general municipal purpose'' or for a ''strictly municipal purpose,'' as the quoted terms are used in the statute. A careful reading of § 9490, *supra,* discloses no requirement that an election be had in all cases of contemplated indebtedness for all municipal ''public utility'' purposes as that term is described in § 9488, *supra.* Section 9490, *supra,* discloses no legislative intention to deprive municipal corporations of the constitutional right to incur an indebtedness of one and one-half per cent for any proper municipal purpose by action of the city council alone. It provides that the total indebtedness shall not exceed the five per cent limitation, except ''for supplying such city or town with water, artificial light and sewers . . .,'' in which event the city or town may become indebted to a larger amount, ''but not exceeding five per centum additional.'' This portion of § 9490, *supra,* covers the same ground as §§ 9532 and 9533, quoted above.

We agree with the argument of counsel for respondents that

''The constitution and this 'utility act' contemplate more than the mere furnishing of tools or of the incidental labor of hauling the tools or pipes to the place of the work. The supplying of tools and equipment to be used by laborers for the construction of a trunk sewer, the entire cost of which, except for the mere supplying of such tools and equipment, is to be paid by the Federal government, is so remote from the sub-

ject matter dealt with by the constitutional provision and by the public utility law as to be regarded wholly outside the inhibitions and provisions thereof. Likewise, the furnishing of trucks and pipe hauling in aid of the Federal government in its work of construction is so incidental and so remote from the thing intended to be regulated by the constitution and the public utility law that it cannot reasonably be said that the indebtedness for such matters is an indebtedness incurred for the *acquisition* of the 'works' which, as a result of such expenditure, is to be acquired and to be owned by the municipality. It is clear also that the city of Spokane in furnishing the 'pipe, equipment and trucks' and doing the 'pipe-hauling' in aid of the work being done by the Civil Works Administration, is not thereby *'purchasing, acquiring or constructing'* sewers, within the meaning of the opening language of Section 9489.''

The judgment is affirmed.

BEALS, C. J., GERAGHTY, MAIN, MITCHELL, HOLCOMB, and STEINERT, JJ., concur.

TOLMAN, J. (dissenting)—I seriously question that portion of the opinion of the majority which holds that a debt authorized by a vote of the people, and therefore falling within the three and one-half per cent classification, can be refunded by the city council without the sanction of the electorate and still retain its classification as a debt authorized by the voters.

It is true that the authorities generally hold that the refunding of an existing indebtedness does not create a new or additional debt. 6 McQuillin on Municipal Corporations, (2nd ed.) § 2385. But that presupposes that the refunding is done by the same power or authority which originally contracted the debt.

The only decided case which our limited search has revealed which seems to cover the particular point we are now discussing is *Veatch v. Moscow*, 18 Ida. 313,

109 Pac. 722, and that case, it may be frankly admitted, seems fairly to support the views of the majority. I cannot, however, accept its logic nor concur in its disapproval of the decision of the supreme court of the United States in *Doon Township v. Cummins,* 142 U. S. 366, 12 S. Ct. 220. While, in the case last referred to, the supreme court of the United States has gone far beyond the position which we here take, and notwithstanding some of our state courts have disapproved, I still believe that it announces a sound ruling. For further discussion throwing light upon the question, see *Powell v. Madison,* 107 Ind. 106, 8 N. E. 31, and *Los Angeles v. Teed,* 112 Cal. 319, 44 Pac. 580.

In none of these cases, however, save the Idaho case, were the facts comparable with the facts here involved, and in none was an attempt made by a city council or other political body to deal with a debt authorized by a vote of the people which it could not have legally incurred in the first instance.

Upon the broad principle of pure logic, how can it be held that a city council, having no power to contract the original debt, may, nevertheless, refund and extend the life of that debt for twenty years and obligate the municipality to pay interest thereon throughout the extended period? When the council so attempts, it must necessarily bring the debt with which it deals within that limit where it has the power to act; and the extended obligation, because of the limited power of the council, must thereafter fall within the classification over which the power of the council extends.

The voters, in the first instance, authorized a bond issue of four hundred thousand dollars, bearing interest at the rate of five per cent per annum. They had a right to assume that the municipal authorities

would provide means to pay both interest and principal, according to the terms which were embodied in the proposition adopted by their votes. In the twenty-five years intervening, the taxpayers paid five hundred thousand dollars in interest, but the principal remained wholly undischarged. The taxpayers now face the necessity of paying another four hundred thousand dollars in annual interest during the extended period, and still another four hundred thousand dollars to retire the principal of the debt; or, as the only alternative, they will be faced by another similar refunding operation by the city council in which they will have no voice. Under the ruling of the majority, such refunding may continue indefinitely and without end at the discretion of the city council, so that the voters, once having authorized a bond issue, may be kept perpetually under the yoke of paying interest thereon.

Our brief search has revealed no authority, except as herein mentioned, touching upon the particular question as it now arises under the peculiar terms of our constitution; and, in the absence of conclusive authority to the contrary, we should adopt and reaffirm the principle laid down in *Tabb v. Funk,* 170 Wash. 545, 17 P. (2d) 18, where we clearly held that this particular debt so refunded was not any longer a debt authorized by a vote of the electorate, and that it therefore fell within the one and one-half per cent classification.

In my opinion, that holding was sound, because the city council, having no power to incur the debt originally, had no semblance of right at the later date to usurp the power lodged in the electorate and continue in force an obligation which the voters had incurred under strict limitations. The practical effect of the holding otherwise is to multiply many times a debt authorized by the voters and that without their consent.

Because it seems to me self-evident that one without power to create a liability has no power to extend and continue such a liability in force with its added interest obligations, I cannot yield my assent to the views expressed by the majority.

BLAKE, J., concurs with TOLMAN, J.

### SUPPLEMENTAL DECISION.

[*En Banc.* April 28, 1934.]

PER CURIAM.—Upon further consideration, we have concluded to amplify the opinion in this case.

■ The evidence is undisputed, the appellant concedes, and the trial court expressly found—that finding is quoted as follows (*ante* p. 364) that:

"This refunding was accomplished by the actual payment and retirement of the old bonds of $400,000 and by the issuance, immediately thereafter, as such old bonds were retired and cancelled, of the new refunding bonds, which were so issued, so that said old bonds of $400,000 which had been authorized by a vote of the electorate in 1907 were in fact paid and retired immediately before the issuance of the refunding bonds authorized by said Ordinance C5165, . . ."

Counsel for respondents cited and discussed *State ex rel. Atkinson v. Ross,* 43 Wash. 290, 86 Pac. 575, and *State ex rel. Jones v. McGraw,* 12 Wash. 541, 41 Pac. 893. We agree with counsel for respondents that those cases were founded upon the assumption that the old bonds were not repaid or retired until after the refunding bonds were issued, and on that basis we held that the new bonds constituted an increase of indebtedness. In the case at bar, the old bonds were in fact retired before the refunding bonds were issued. Clearly, the cases cited are inapplicable; they are distinguishable on the facts from the case at bar. Nor is

the case of *Doon Township v. Cummins,* 142 U. S. 366, 12 S. Ct. 220, in point.

"It is the universal rule that where a municipality issues new securities and exchanges them directly for old ones, or in the payment of a valid existing indebtedness, the transaction is not an increase within the meaning of constitutional and statutory provisions, since the new securities as soon as issued extinguish the old debt, and therefore the aggregate outstanding indebtedness is the same at all times. *Maish v. Arizona,* 164 U. S. 599, 41 L. Ed. 567, 17 Sup. Ct. Rep. 193; *Mitchell v. Smith,* 12 S. D. 241, 80 N. W. 1077; *Los Angeles v. Teed,* 112 Cal. 319, 44 Pac. 580; *Butler v. Lewiston,* 11 Idaho 393, 83 Pac. 234.

"When, however, the scheme is for the issuance and sale of new securities in the market, and the proceeds thereof are to be used to pay outstanding indebtedness at a later date, there are two distinct and contradictory rules. The first rule and the reasoning in support thereof is best set forth in the case of *Doon Township v. Cummins,* 142 U. S. 366, 35 L. Ed. 1044, 12 Sup. Ct. Rep. 222. We quote as follows:

" 'There is a wide difference in the two alternatives which this statute undertakes to authorize. The second alternative, of exchanging bonds issued under the statute for outstanding bonds, by which the new bonds, as soon as issued to the holders of the old ones, would be a substitute for and an extinguishment of them so that the aggregate outstanding indebtedness of the corporation would not be increased, might be consistent with the Constitution. But under the first alternative, by which the treasurer is authorized to sell the new bonds and to apply the proceeds of the sale to the payment of the outstanding ones, it is evident that if (as in the case at bar), new bonds are issued without a cancellation or surrender of the old ones, the aggregate debt outstanding, and on which the corporation is liable to be sued, is at once and necessarily increased, and, if new bonds equal in amount to the old ones are so issued at one time, is doubled; and that it will remain at the increased amount until the proceeds of

the new bonds are applied to the payment of the old ones, or until some of the obligations are otherwise discharged.

" 'It is true that if the proceeds of the sale are used by the municipal officers, as directed by the statute, in paying off the old debt, the aggregate indebtedness will ultimately be reduced to the former limit. But it is none the less true, that it has been increased in the interval; and that unless those officers do their duty, the increase will be permanent. It would be inconsistent alike with the words, and with the object, of the constitutional provision, framed to protect municipal corporations from being loaded with debt beyond a certain limit, to make their liability to be charged with debts contracted beyond that limit depend solely upon the discretion or the honesty of their officers.' " *Citrus Growers' Development Ass'n v. Salt River Valley Water Users' Ass'n,* 34 Ariz. 105, 268 Pac. 773 (780).

TOLMAN, J. (dissenting)—The finding of fact by the trial court upon which the majority rests its judgment is duplicitous and inconsistent. That finding, quoted *in extenso* in the original opinion and in part quoted in the supplemental *per curiam* opinion, expressly finds (1) that there was an actual payment of the old bonds in the full amount authorized by the voters before the new bonds authorized by the city council were issued. If that part of the finding be true, then the debt authorized by the voters was paid and extinguished, and there was no debt in existence authorized by the voters to be refunded by anyone or at all.

Notwithstanding the finding of such actual payment which extinguished the debt, the finding proceeds (2) to recite the enactment of a refunding ordinance and the issuance of new refunding bonds by the city council, and the finding continues:

"Therefore, inasmuch as the refunding bond *indebtedness* is a mere continuation of the preceding indebtedness, which was authorized by a vote of the elec-

torate in 1907, we have placed this refunding bond issue of $400,000, authorized by Ordinance C5165 within the same, viz., the 3½% classification, which includes all indebtedness authorized by popular vote.''

Since, by the supplemental *per curiam* opinion, the majority seems to recognize the force of our previous holdings in *State ex rel. Atkinson v. Ross,* 43 Wash. 290, 86 Pac. 575, and *State ex rel. Jones v. McGraw,* 12 Wash. 541, 41 Pac. 893, and seeks to distinguish and not to overrule those cases, I am less concerned with the results here, but on principle and as a matter of ordinary logic, it seems to me self-evident that we ought not directly or indirectly to approve the inconsistency embodied in the finding of the trial court or the erroneous conclusion drawn therefrom.

Manifestly, when the four hundred thousand dollars in bonds became due, the voters who had authorized the issue should have been given the opportunity to authorize or refuse to authorize the refunding of that issue. If the debt could not be contracted in the first place without a popular vote, then it should follow that it could only be refunded by a popular vote. If, however, the first part of the trial court's finding be accepted as controlling and if the bond issue was actually paid and retired, the authorization given by the voters in 1907 ended with the retirement of the bonds which their vote had sanctioned; and the city council could only act with reference to a refunding issue of bonds within the 1½% classification as authorized by the constitution.

Therefore, when, as shown by the second part of the trial court's finding, the city council passed ordinance C5165, it made the debt of four hundred thousand dollars a debt within the 1½% classification and the trial

court was in error when it scheduled the four hundred thousand dollars of bonds authorized by the city council as being within the 3½% classification.

BLAKE, J., concurs with TOLMAN, J.